# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) |
| Keith F. Simmons, an individual; Black Diamond Capital Solutions, L.L.C.; Black Diamond Holdings, L.L.C.; Deanna Salazar, an individual; Life Plus Group L.L.C.; Bryan Coats, an individual; Genesis Wealth Management, L.L.C.; Jonathan Davey, an individual; Divine Circulation Services, L.L.C.; Safe Harbor Ventures, Inc.; Safe Harbor Wealth Investments, Inc.; Divine Stewardship, L.L.C.; and Safe Harbor Wealth, Inc. | ) CASE NO. _____ ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants, and | ) ) |
| Lawrence Salazar, an individual; Eco-Green, L.L.C.; Black Diamond Associates, L.L.C.; High South Realty, L.L.C.; The Gallery Group, L.L.C.; Coats Estate Planning Services, Inc.; Coats Wealth Management, Inc.; Sovereign Grace, Inc.; and Shiloh Estate, L.L.C. | ) ) ) ) ) ) ) ) ) |
| Relief Defendants. | ) ) ) |

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF

Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC")

alleges as follows:

1

# I.   SUMMARY

1.     Since at least April 2007 through the present ("relevant period"), Defendants Keith Simmons ("Simmons") and Black Diamond Capital Solutions, L.L.C. ( "BDCS"), by and through Defendants Black Diamond Holdings L.L.C. ( "BD Holdings"); Deanna Salazar and Life Plus Group, L.L.C. (collectively "Salazar"); Bryan Coats and Genesis Wealth Management, L.L.C. (collectively "Coats"); Jonathan Davey ( "Davey"); Divine Circulation Services, L.L.C.. Safe Harbor Ventures Inc.; Safe Harbor Wealth Investments, Inc.; Divine Stewardship, L.L.C.; and Safe Harbor Wealth, Inc., orchestrated an approximately $35 million foreign currency "Ponzi" style fraudulent scheme.

2.     Simmons, by and through the other Defendants, fraudulently solicited and/or accepted approximately $35 million from at least 240 individuals or entities for the purported purpose of trading a pooled investment in connection with agreements, contracts, or transactions in off-exchange foreign currency ("forex") that are margined or leveraged.  Simmons allegedly traded forex on behalf of customers through the purported Black Diamond forex trading platform.  Throughout the scheme, the Defendants used the names BDCS, BD Holdings and Black Diamond platform interchangeably and synonymously; herein they will be cited collectively as "Black Diamond."

3.     Simmons created the framework for the fraudulent scheme by entering into joint ventures first with Salazar and then with Salazar and Coats.  These joint ventures provided that Salazar and Coats would solicit new customers for Black Diamond, and that Simmons, Salazar and Coats would share a percentage of the alleged trading gains realized by the customers Salazar and Coats brought to Black Diamond.  These joint ventures extended the reach of the Black Diamond fraudulent scheme to individuals across the United States.

2

4.     Simmons, Salazar, Coats and Davey fraudulently solicited customers by making material misrepresentations and omissions, including, but not limited to, that: (1) the Black Diamond trading platform existed and customer funds were invested in forex trading; (2) Black Diamond had at least a three year history of highly successful forex trading and consistently earned positive returns for customers with average returns exceeding four percent per month; (3) Black Diamond trading was based on an advisory system created by qualified platform developers; (4) the risks of trading forex through Black Diamond were limited because Black Diamond promised that no more than twenty percent (20%) of invested funds were at risk at any time and because trading stop mechanisms would be employed if necessary; and (5) sufficient funds were available to be returned to customers upon request.

5.     Defendants Salazar, Coats and Davey perpetuated the fraud orchestrated by Simmons, by knowingly or recklessly making the same or similar false misrepresentations and omissions to customers as set forth above to solicit new funds or to reassure customers their funds would be returned.  These Defendants knowingly or recklessly committed fraud in connection with Simmons' forex scam.

6.     No forex trading was ever conducted through Black Diamond on behalf of customers.  Instead Simmons, Salazar, Coats and Davey misappropriated millions of dollars for personal and unrelated business expenses, and to make payments to other customers. Specifically, Simmons, Salazar, Coats and Davey used customer money intended for forex trading through Black Diamond to pay for vehicles, real estate purchases, and expensive personal and business trips, as well as to finance side businesses or investments.

7.     To conceal the misappropriation and lack of trading, Simmons issued, or caused to be issued through the assistance of Salazar, Coats and Davey, false account statements or

3

reports of account performance to customers reflecting the promised returns (or more) based on Black Diamond's purportedly successful trading of forex contracts.

8.      Beginning in or about March 2009, Black Diamond and Simmons, directly and through Salazar, Coats and Davey, began to refuse to return funds or make payments to customers.

9.      To continue concealing the fraud, as clients sought to withdraw funds or made redemption requests, Simmons, directly and through Salazar, Coats and Davey, made a series of excuses and false representations for not meeting customers' demands for return of their funds and to reassure customers their funds were safe, including, but not limited to: (1) representing that various agencies in the federal government were conducting unrelated investigations that had the effect of freezing Black Diamond accounts; (2) altering a bank document to reflect a fictitious balance of $77 million; (3) blaming banking requirements and restrictions for delaying distributions to customers; (4) claiming a non-existent German liquidity provider by the name of Klaus would provide $120 million to Black Diamond to payout customers and replace Black Diamond on the purported platform; and (5) providing a list of real estate investments as security for the funds allegedly being traded in forex through Black Diamond.  Defendants were making or perpetuating these excuses at least as recently as December 2009.

10.      Even after they failed to respond to customer withdrawal requests, Defendants Simmons, Salazar, Coats and Davey knowingly or recklessly continued to solicit new customers, accept additional deposits from existing customers, and issue monthly statements to all customers showing significant forex trading profits.

11.      By virtue of this conduct and the further conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices in violation of Sections

4b(a)(2)(A)-(C) of the Commodity Exchange Act ("CEA" or "Act"), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101 - 13204, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

12.    Relief Defendants Lawrence Salazar ("L. Salazar"); Eco-Green, L.L.C. ("Eco-Green"); Black Diamond Associates, L.L.C. ("BD Associates"); High South Realty, L.L.C. ("High South"); The Gallery Group, L.L.C.; Coats Estate Planning Services, Inc. ("Coats Estate, Inc."); Coats Wealth Management, Inc. ("Coats Wealth"); Sovereign Grace, Inc. ("Sovereign Grace"); and Shiloh Estate, L.L.C. ("Shiloh Estate"), who are not charged with violations of the Act and/or Regulations, received funds and assets from Defendants to which they hold no legitimate interest or entitlement and which were derived from Defendants' fraudulent and violative acts.  The Relief Defendants therefore must return and repay these funds.

13.    Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2), the Commission brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act, and to further enjoin Defendants from engaging in any commodity-related activity.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

14.    Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

## II.   JURISDICTION AND VENUE

15.     Section 6c(a) of the Act, 7 U.S.C. § 13a-1 (2006), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.

16.     The Commission has jurisdiction over this matter as alleged herein pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and Section 2(c)(2) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2).

17.     Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), because Defendants transacted business in the Western District of North Carolina and certain of the transactions, acts, practices, and courses of business alleged occurred, are occurring, and/or are about to occur within this District.

## III.    PARTIES

**Plaintiff**

18.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.* (2006), as amended by the CRA, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010).  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

**Defendant Simmons and his Related Companies**

19.     Defendant **Keith Simmons** maintains a residence in West Jefferson, North Carolina.  Simmons has never been registered with the CFTC in any capacity.  Through Black Diamond Capital Solutions L.L.C., Simmons is a party to the joint venture BD Holdings and is

6

also the owner and/or registered agent of the entities listed below.  These companies have never been registered with the CFTC in any capacity and are not financial institutions, registered broker dealers (or their associated persons), insurance companies, bank holding companies, or investment bank holding companies.  The Simmons companies are:

- Defendant **Black Diamond Capital Solutions, L.L.C.** is a North Carolina Limited Liability Company organized by Simmons in 2005, with its principal place of business at 522 S. Main St., West Jefferson, North Carolina 28640. BDCS was administratively dissolved by the North Carolina Secretary of State on August 25, 2010.

- Relief Defendant **Eco-Green, L.L.C.** is a North Carolina Limited Liability Company formed in May 2008, with its principal place of business at 19 E. Ashe St., West Jefferson, North Carolina 28694.  Eco-Green received funds of defrauded investors to which it had no legitimate interest or entitlement.

- Relief Defendant **Black Diamond Associates, L.L.C.** is a North Carolina Limited Liability Company formed in January 2008, with the same principal place of business as the principal place of business of BDCS.  BD Associates received funds of defrauded investors to which it had no legitimate interest or entitlement.

- Relief Defendant **High South Realty, L.L.C.** is a North Carolina Limited Liability Company formed in May 2007, with the same principal place of business as the principal place of business of BDCS.  High South received funds of defrauded investors to which it had no legitimate interest or entitlement.

- Relief Defendant **The Gallery Group, L.L.C.** is a North Carolina Limited Liability Company formed in June 2008, with a registered office address of 230

7

Hice Avenue, West Jefferson, North Carolina 28694. The Gallery Group received

funds of defrauded investors to which it had no legitimate interest or entitlement.

On December 17, 2009, Simmons was arrested by the Federal Bureau of Investigation

("FBI"), and on January 20, 2010, he was indicted on related charges in a federal criminal action

entitled *United States v. Keith Franklin Simmons*, 3:10-cr-23, W.D.N.C. Simmons was

convicted on four counts of securities fraud, wire fraud and money laundering on December 16,

2010, and is incarcerated in Mecklenburg County, North Carolina.

**Defendants Salazar and Life Plus Group, L.L.C.**

20.     Defendant **Deanna Salazar** resides in Yucca Valley, California, is the

owner/manager of Life Plus Group, L.L.C., and through Life Plus is a party to the joint venture

BD Holdings. Salazar was registered with the CFTC as an Associated Person of various

registered Introducing Brokers during the period of February 2005 through March 2008, which

includes the relevant period here. On December 7, 2010, Salazar pleaded guilty to bill of

information charging her one count of conspiracy to commit investment fraud and one count of

tax evasion in connection with her involvement with Life Plus and Black Diamond, *United*

*States v. Deanna Ray Salazar*, 3:10-cr-244, W.D.N.C.

21.     Defendant **Life Plus Group L.L.C.** is a Limited Liability Company organized in

Wyoming and formed on July 2, 2007. It is located at 56783 Free Gold Drive, Yucca Valley,

California 92284, and is owned by Salazar with her husband, Relief Defendant L. Salazar. Life

Plus has not been registered with the CFTC in any capacity and is not a financial institution,

registered broker-dealer (or their associated person), insurance company, bank holding company

or investment bank holding company.

8

**Defendants Coats and His Related Companies**

22.     Defendant **Bryan Coats** resides in Clayton, North Carolina. Coats has never been registered with the CFTC in any capacity. Coats, through Coats Estate, Inc., is a party to the joint venture BD Holdings and is the owner and/or agent of the entities listed below, all of which share a principal place of business at 120 Hibiscus Drive, Clayton, North Carolina 27527. These companies have never been registered with the CFTC in any capacity and are not financial institutions, registered broker dealers (or their associated persons), insurance companies, bank holding companies or investment bank holding companies. The Coats companies are:

- Defendant **Genesis Wealth Management, L.L.C.** ("GWM") is a Delaware Limited Liability Company organized in 2008. GWM is wholly owned by Coats and is the general partner of **Genesis Wealth Partners LP** ("GWP"), a Delaware Limited Partnership formed by Coats for the purpose of investing in Black Diamond.

- Relief Defendant **Coats Estate Planning Services, Inc.** is a North Carolina corporation formed in 2004. Upon information and belief, Coats originally formed Coats Estate, Inc. to operate as an insurance sales business, but in late 2007 through mid-2008, he used Coats Estate, Inc. to solicit customer funds for Black Diamond. By June 2008, Coats Estate, Inc. became a subsidiary of Coats Wealth and the customers solicited under Coats Estate, Inc. became limited partners of GWP. Although Coats no longer used Coats Estate, Inc. to solicit customers after June 2008, Coats Estate, Inc. received funds of defrauded investors to which it had no legitimate interest or entitlement.

- Relief Defendant **Coats Wealth Management, Inc.** is a North Carolina corporation formed in 2008. Coats Wealth received funds of defrauded investors to which it had no legitimate interest or entitlement.

The North Carolina Secretary of State Securities Division entered a consent order against Coats on March 11, 2008, wherein Coats was ordered to "cease and desist from offering to sell or selling securities of any kind in the State of North Carolina" due to his failure to register as a securities dealer or salesman pursuant to North Carolina law. *See State of North Carolina Department of the Secretary of State File No. 07-005-CC,* Summary Order to Cease and Desist, issued Sept. 11, 2007, and Consent Order, issued March 11, 2008.

### Defendant BD Holdings

23. Defendant **Black Diamond Holdings, L.L.C.** is a Wyoming Limited Liability Company with a listed principal place of business at 56783 Free Gold Drive, Yucca Valley, California 92284. BD Holdings is a joint venture in which Simmons, Salazar and Coats through their respective companies are equal partners. BD Holdings has never been registered with the CFTC in any capacity and is not a financial institution, registered broker dealer (or their associated person), insurance company, bank holding company or investment bank holding company.

### Defendant Jonathan Davey and His Related Companies

24. Defendant **Jonathan Davey** resides in Newark, Ohio. Davey is a Certified Public Accountant in the State of Ohio and was a Registered Investment Advisor until August 2010. Davey has never been registered with the CFTC in any capacity. Davey is the agent and/or controlling person of the entities listed below, including **Divine Circulation Services, Ltd.** ("Divine Ltd."), a Belize International Business Company formed by Davey in 2007 as an

10

investment pool/hedge fund that invested in forex trading through Black Diamond. All of
Davey's entities operated out of the same location, namely 35 South Park Place, Suite 10,
Newark, Ohio 43055. Davey and these companies have never been registered with the CFTC in
any capacity and are not financial institutions, registered broker dealers (or their associated
persons), insurance companies, bank holding companies, or investment bank holding companies.
The Davey companies are:

- Defendant **Divine Circulation Services, L.L.C.** ("Divine L.L.C.") is an Ohio
  Limited Liability Company formed in 2007, and is wholly owned by Safe Harbor
  Ventures, Inc. ("SHV"). Davey used Divine L.L.C. to hold the bank accounts
  through which customer money flowed to Black Diamond from Davey's
  companies and the Hedge Funds.

- Defendant **Safe Harbor Ventures, Inc.** is a Delaware corporation formed in
  2005, and is owned by Shari Davey, the wife of Davey.

- Defendant **Safe Harbor Wealth Investments, Inc.** is an Ohio corporation formed
  in 2001. SHWII provides administrative services to SHV in the management of
  the funds flowing through Davey's companies to Black Diamond.

- Defendant **Divine Stewardship, L.L.C.**, is an Ohio corporation formed in May
  2009. Divine Stewardship is an entity created and controlled by Davey
  purportedly to assume SWHII's assets, policies, and management.

- Defendant **Safe Harbor Wealth, Inc.** is an Ohio corporation formed in 2000 and
  is a public accounting firm licensed in the State of Ohio. SHW provided
  accounting services for Davey's companies related to its movement of funds to
  Black Diamond.

11

- Relief Defendant **Shiloh Estate, L.L.C.** is a Delaware Limited Liability Company which was owned by Sovereign Grace until January 2010. Davey created Shiloh Estate for the purpose of holding real estate. Shiloh Estate received funds of defrauded investors to which it had no legitimate interest or entitlement.

- Relief Defendant **Sovereign Grace, Inc.** is a Belize International Business Company and was the owner and sole member of Shiloh Estate until January 2010. Davey is the beneficial owner of Sovereign Grace. Sovereign Grace received funds of defrauded investors to which it had no legitimate interest or entitlement.

**Relief Defendant Lawrence Salazar**

25.     Relief Defendant **Lawrence Salazar** resides in Yucca Valley, California. L. Salazar is a principal of Life Plus, is married to Salazar and has never been registered with the Commission in any capacity. L. Salazar provided no services to Life Plus but received funds of defrauded investors to which he had no legitimate interest or entitlement.

## IV.     FACTS

### A.  Defendants' Fraudulent Solicitation of Individuals/Entities to Trade Forex through Black Diamond

### 1.     Formation of BD Holdings and Black Diamond Promotional Materials

26.     The allegations set forth in paragraphs 1 through 25 are realleged and incorporated herein by reference.

27.     During the relevant period, Black Diamond, Simmons, Salazar, Coats, Davey, Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW orchestrated a forex "Ponzi" style fraudulent scheme by fraudulently soliciting and/or accepting approximately $35 million from at least 240 individuals or entities for the purported purpose of trading a pooled investment in

12

connection with agreements, contracts, or transactions in forex that are margined or leveraged. Many of the Black Diamond clients invested with Black Diamond after June 2008. However, the fraudulent scheme has been in operation since at least April 2007.

28.    Simmons, Salazar, Coats and Davey solicited individuals to trade forex by direct solicitations, word-of-mouth or personal referrals, promotional materials, websites or other written solicitations.

29.    Many of those solicited by Defendants were family members, friends and church associates.

30.    At least certain of Defendants' customers, if not all, were individuals who each had total assets of less than $5 million. Thus, these customers were not "eligible contract participants" as that term is defined in the Act. *See* Section 1a(12)(A)(xi) of the Act, 7 U.S.C. § 1a(12)(A)(xi) (2006) (an "eligible contract participant," as relevant here, is an individual with total assets in excess of (i) $10 million, or (ii) $5 million and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be incurred, by the individual").

31.    During the relevant period, Simmons was a controlling person of BDCS. He held himself out as the principal of BDCS and, in various documents and communications, he was described as the owner and operator of BDCS. Simmons exercised control over the day-to-day business operations of BDCS. He controlled the bank accounts opened and maintained in the name of BDCS. He was responsible for computing the monthly percentage return on the purported forex trading that was used to calculate the gains on Black Diamond customers' accounts.

32.     Simmons first solicited Salazar to invest in forex through Black Diamond in April 2007, and subsequently entered into a joint venture with Salazar (the "Simmons-Salazar Venture") to further perpetuate the fraudulent scheme.

33.     The Simmons-Salazar Venture provided that Salazar, through her company Life Plus, would market forex trading through Black Diamond to her customers. Salazar and Simmons would then split equally the Simmons-Salazar Venture's share of profits achieved by any new customers brought to Black Diamond by Salazar.

34.     During the relevant period, Salazar was a controlling person of Life Plus. She held herself out as the principal of Life Plus and was described as the owner of Life Plus in various documents and communications. Salazar exercised control over the day-to-day business operations of Life Plus. She controlled the bank accounts opened and maintained in the name of Life Plus. She solicited customers to invest in Life Plus for the purpose of trading forex through Black Diamond. She was also responsible for the content of the Life Plus account statements distributed to pool participants.

35.     In October 2007, Simmons and Salazar solicited Coats to invest in forex through Black Diamond; Coats signed the Black Diamond trading agreement on behalf of Coats Estate, Inc. to become an investor in Black Diamond.

36.     Subsequently, Simmons and Salazar, by and through their respective companies BDCS and Life Plus, entered into a separate joint venture with Coats and Coats Estate, Inc. According to the agreement, the joint venture was to be conducted under the name BDCS; but later the Defendants changed the name to BD Holdings. Regardless, Simmons, Salazar and Coats continued to use the names Black Diamond, BDCS and BD Holdings interchangeably in their forex materials, solicitations and communications with customers.

14

37.     Through BD Holdings, Coats marketed forex trading with Black Diamond to prospective customers of Coats Estate Inc., and developed new customers for Black Diamond. BD Holdings earned a percentage of the purported trading profits realized by each customer brought to Black Diamond by Coats. Simmons, Salazar and Coats split equally among themselves BD Holdings' share of customer profits, calling them "owner gains."

38.     During the relevant period, Simmons, Salazar and Coats were controlling persons of BD Holdings through their respective control of BDCS, Life Plus and Coats Estate, Inc. Simmons, Salazar and Coats signed the joint venture agreement on behalf of their respective corporate entities to be an equal one-third partner in BD Holdings.

39.     Simmons, Salazar and Coats jointly developed the promotional materials they distributed to potential Black Diamond customers.

40.     Salazar and Coats, and Simmons, through Salazar and Coats, provided the Black Diamond promotional materials to persons/entities they were soliciting.

41.     These promotional materials falsely claimed that Black Diamond offered exclusive access to an automatic computerized trading system created by a group of software developers to trade forex. Salazar claimed she had access to that system through her company Life Plus; Coats claimed that he had access to that system through his company and BD Holdings.

42.     One Black Diamond promotional document boasted the system had been trading forex for over 36 months and every month exceeded the target of four percent gain per month ("48 percent annually uncompounded").

43.     One version of this Black Diamond promotional document purported to show "Actual results for Account Holder for the past 12 months," with profitable trading results for

2008 of between 4.765 percent and 13.357 percent per month. It also purported to show an actual three year trading history with consistently positive monthly returns, often in excess of ten percent, and a three year balance reflecting the outstandingly positive results of $194,340.37 on an initial $5000 investment.

44.     The material further promised potential customers their investment was safe: "Your account becomes liquid after 90 days. The system is setup [sic] with a 10% stop loss **to minimize risk**" (emphasis added). The materials did not otherwise disclose the significant risks of trading forex on a leveraged basis.

45.     Salazar and Coats, and Simmons, through Salazar and Coats, provided to customers a customer agreement entitled "Black Diamond Currency Exchange Agreement – Growth Account" ("Black Diamond Agreement") which stated that customers would be engaging Black Diamond "to hold and exchange free trading international spot market currencies on controlled margin for Account Holder" and represented that Black Diamond "will maintain and hold all Currencies, directly or indirectly, at a top tier FCM Currency Exchanger/Dealer." The term "FCM" or Futures Commission Merchant is a term reflecting a type of entity required to be registered with the Commission. Regulation 1.3(p)(1), 17 C.F.R. § 1.3(p)(1), defines a FCM as individuals, associations, partnerships, corporations, and trusts that solicit or accept orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market and that accept payment from or extend credit to those whose orders are accepted. By using the phrase "top tier FCM," Defendants sought to convince prospective customers their funds would be held and traded at a legitimate trading firm regulated by the Commission when in fact they were not.

16

46.     The Black Diamond Agreement promised the use of leverage in its forex trading and offered customers the purported opportunity to terminate their agreements upon request. The Agreement further stated that customers would receive monthly and annual account statements.

47.     The Black Diamond Agreement acknowledged that an account holder's funds would be "co-mingled," or, in other words, pooled with funds of other account holders and falsely reassured that Black Diamond "shall have no right to deplete or withdraw Account Holders [sic] currencies at any time for any purpose other than exchanging currencies pursuant to the guidelines defined herein."

48.     The Black Diamond Agreement downplayed the risk of loss inherent in trading forex by merely noting that investments in forex by Black Diamond are on a "Best Efforts Basis" and "past performance is not necessarily indicative of future results." The Black Diamond Agreement further assured customers the risk of trading forex through Black Diamond was limited because no more than 10 or 20 percent (with the percentage varying by customer) of invested funds were at risk at any time and because trading stop mechanisms would be employed if necessary.

49.     The Black Diamond Agreement provided that profits earned by an Account Holder would be split with Black Diamond in some percentage that varied by customer (usually a 50/50, 55/45 or 60/40 split) after fees were paid "to trading professionals and third party brokerage," further giving the appearance that legitimate trading was occurring.

50.     Despite their use of these promotional materials, Salazar and Coats failed to conduct any due diligence to confirm or verify the content of the Black Diamond promotional material or the Black Diamond Agreement that they assisted Simmons in developing.

17

51. Salazar and Coats knew, or recklessly failed to ascertain, the content of these documents was in fact false and persisted in distributing these documents to prospective customers.

## 2. **Solicitations by Salazar**

52. In or about August 2007, Salazar, through her company Life Plus, began soliciting customers to trade forex through Black Diamond, often distributing the Black Diamond promotional materials described above.

53. In oral solicitations, emails and other documents, Salazar touted Black Diamond's successful forex trading to numerous potential customers and represented that Life Plus had a prior business relationship with Black Diamond.

54. Salazar further represented that Life Plus had consulted the Black Diamond system developers on whether to offer the forex trading system publicly or to keep it private. Salazar claimed that based on this consultation, Black Diamond was kept private and Life Plus customers had access to the system through the Simmons-Salazar Venture.

55. In at least one solicitation, Salazar provided a prospective customer with the Black Diamond promotional materials showing the purported three year history of successful trading reflecting extremely high returns. These promotional materials claimed that Black Diamond's program was highly successful because it used a unique software program that utilized highly specialized computer models that gave buy and sell signals. The customer relied upon these representations in making the decision to invest with Black Diamond through Salazar.

56. Salazar intended for customers to rely on the representations and/or omissions she made to induce those individuals/entities to invest with Black Diamond.

57. To aid in the solicitation of customers, Salazar entered into "Co-Facilitator Agreements" with certain of her customers. These agreements authorized others, so-called "Facilitators," to solicit customers to trade forex through Black Diamond in exchange for a marketing service fee. If a Facilitator successfully solicited a customer to invest in Black Diamond, then Simmons and Salazar would further divide their portion of the supposed trading profits with the referring Facilitator. As a result of these Co-Faciliator agreements, the Black Diamond fraudulent scheme was extended to numerous individuals/entities across California, Colorado, Texas, and other states.

58. In addition to the Black Diamond promotional material described above, Salazar, directly or through her Facilitators, provided customers with a one-page trading agreement to sign. The trading agreement provided that customers would participate with both Black Diamond and Life Plus in a forex trading account held by Black Diamond at a third party brokerage (the "Black Diamond/Life Plus Membership Agreement"). The Black Diamond/Life Plus Membership Agreement, like the Black Diamond Agreement, provided for a percentage split that varied by customer (usually ranging from 50/50 to 60/40) of net profits between the account holder and Black Diamond/Life Plus.

59. Salazar signed many, if not most, of these agreements as an officer of Black Diamond and Life Plus. Many, if not most, of Salazar's customers also completed an account information form wherein Salazar's name appeared on the signature line as an officer of Black Diamond as well as Life Plus.

**3.   Solicitations by Coats**

60. Coats began his association with Black Diamond, Simmons and Salazar in October 2007 when he opened a Black Diamond forex trading account for Coats Estate, Inc.

Initially, he solicited customers as a Facilitator for Salazar pursuant to the Simmons-Salazar Venture. By December 2007, after BD Holdings was formed, Coats began soliciting customers to trade forex through Black Diamond pursuant to the BD Holdings joint venture agreement.

61.     Through oral solicitations, emails and other documents, including the Black Diamond promotional materials and the Black Diamond Agreement, Coats touted Black Diamond's successful forex trading to numerous potential customers.

62.     By June 2008, Coats established his own hedge fund, GWP, with GWM as its general partner, to be the vehicle through which he solicited customers for Black Diamond. GWM earned management fees for its administration of GWP; these fees were often deposited into bank accounts in the name of Coats Wealth controlled by Coats.

63.     While GWP had its own trading account with Black Diamond, Coats maintained his Coats Estate, Inc. account in order to collect owner gains from the BD Holdings venture. Coats' existing customers brought in through Coats Estate, Inc. became limited partners of GWP. Coats also solicited new customers for Black Diamond, many of whom became limited partners of GWP.

64.     During the relevant period, Coats was a controlling person of GWM. He held himself out as the principal of GWM and was described as the owner of GWM in various documents and communications. Coats exercised control over the day-to-day business operations of GWM. As GWM was the general partner of GWP, Coats exercised control of GWP through his control of GWM. He controlled the bank account opened and maintained in the name of GWP. He was responsible for the content of the GWP account statements distributed to the GWP partners. He also solicited customers to invest in GWP which was controlled by GWM for the purpose of trading forex through Black Diamond.

65. In his solicitation of customers through GWP, Coats promoted Black Diamond using promotional materials and promoted Black Diamond's purportedly good track record trading forex.

66. Coats intended for customers to rely on the representations and/or omissions he made to induce those individuals/entities to invest with Black Diamond.

67. For his customers, Coats used the Black Diamond/Life Plus Membership Agreement, amended to reflect that customers were entering into a forex trading agreement with Black Diamond, Life Plus and Coats Estate, Inc., calling the three entities "BDFG" (the "BDFG Membership Agreement"). No such company named BDFG existed. However, upon information and belief, BDFG was intended by Simmons, Salazar and Coats in these agreements to mean the joint venture that was later formally incorporated as BD Holdings. Most, if not all, of Coats' customers signed the BDFG Membership Agreement. Coats also signed those agreements representing that he was an officer of the so-called BDFG. Many, if not most, of Coats' customers also completed an account information form wherein Coats's name appeared on the signature line as an officer of BDFG.

68. In December 2007, Coats solicited Defendant Davey to open a forex trading account with Black Diamond on behalf of the customers of his fund Divine Ltd. Davey signed the BDFG Agreement and began sending Divine Ltd. funds to Black Diamond.

69. Coats also recruited individuals to become Hedge Fund Managers in order to solicit additional customers for the Black Diamond scheme. The Hedge Funds created by these Hedge Fund Managers included, among others: J.T. Solutions Partners L.P., St. Croix Partners, L.L.C., Affluent Profusion, L.P., Booya Money Capital Partners L.P., the Lincoln Funds L.P., and Intelligent Design Partners, L.P. These Hedge Fund Managers sent funds on behalf of their

customers to Black Diamond to trade forex through Black Diamond. As a result of these Hedge Funds, the Black Diamond fraudulent scheme was extended to numerous individuals/entities across the United States.

**4.     The Handling of Customer Funds and Davey's Role in the Scheme**

70.     The funds of the customers solicited by Salazar for investment with Black Diamond were deposited either directly into bank accounts in the name of BDCS controlled by Simmons or into bank accounts held jointly by Salazar and Relief Defendant L. Salazar, and/or Life Plus.

71.     In the latter case, Salazar then either wired the funds directly to bank accounts in the name of BDCS controlled by Simmons, or had Simmons or agents of Black Diamond create bookkeeping records to reflect fictitious transfers of funds from Salazar's Black Diamond trading account to the customer's Black Diamond trading account.

72.     These fictitious paper transfers of money from Salazar's trading account to the customer's Black Diamond trading account were contrary to how Salazar's customers understood their funds would be handled. Salazar's customers expected Salazar to send their actual funds promptly to their individual Black Diamond forex trading accounts and did not expect the funds would merely be transferred in a bookkeeping ruse.

73.     Funds flowed back from BDCS bank accounts either directly to Salazar's customers or through bank accounts held jointly in the name of Salazar and Relief Defendant L. Salazar and/or Life Plus.

74.     By early 2009, Davey had become the "third party administrator" of GWP and the Hedge Funds' accounts with Black Diamond. To accomplish this role, he utilized a system of

interrelated companies, namely Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW, which operated as a common enterprise (the "Davey Common Enterprise").

75.    The various entities comprising the Davey Common Enterprise operated out of the same location, at times commingled funds, shared officers and owners, and were under common control.  Davey had the ability to control each entity, and was the outright beneficial owner of certain entities.

76.    Davey used the Davey Common Enterprise to perform administrative tasks, including, but not limited to, bookkeeping and/or accounting services for funds solicited and/or accepted for forex trading through Black Diamond from GWP, Divine Ltd. and the Hedge Funds.

77.    Specifically, the entities comprising the Davey Common Enterprise had the following responsibilities: SHV wholly owned Divine L.L.C. and managed, through Divine L.L.C., the bank account responsible for sending customer funds, including those funds of Divine Ltd. and the Hedge Funds, to Black Diamond; SHWII and/or Divine Stewardship provided administrative services to SHV in the management of the funds flowing through the Davey companies to Black Diamond; and SHW provided accounting services for the Davey companies in its movement of funds to Black Diamond.

78.    The Davey Common Enterprise provided further assistance to the Hedge Funds with regard to database and website support and tax work, and by summer 2009, Davey was a signatory on some of the Hedge Funds' bank accounts.

79.    During the relevant period, Davey was a controlling person of the Davey Common Enterprise.  He held himself out as the principal of each of the entities comprising the Davey Common Enterprise and, in various documents and communications, he was described as

the administrator and beneficial owner of various entities comprising the Davey Common Enterprise. Davey exercised control over the day-to-day business operations of the Davey Common Enterprise. He also controlled the bank accounts opened and maintained in the names of the entities comprising the Davey Common Enterprise.

80. Coats initially had his GWP customers and some of the Hedge Funds send their funds directly to bank accounts in the name of BDCS controlled by Simmons. By early 2009, Coats instructed that all funds from GWP, Divine Ltd., and the Hedge Funds be sent to Black Diamond through bank accounts controlled by the Davey Common Enterprise.

81. Throughout the relevant period, Davey opened and administered several bank accounts at various banks in Ohio through which Black Diamond customer funds flowed, including those of his fund, Divine Ltd. From July 2007 through August 2008, Davey held an account under the name of "Divine Circulation Services L.L.C./Safe Harbor Ventures, Inc." at National City Bank. In June 2008, Davey then opened two accounts at JPMorgan Chase Bank, which he held through May 2009, named "Divine Circulation Services L.L.C. c/o Safe Harbor Wealth" and "Divine Circulation Services Euro LLC."

82. In May 2009, Davey next opened two accounts at Fifth Third Bank under the names "Divine Circulation Services L.L.C./DCS Liquid" and "Divine Circulation Services L.L.C./DCS Clearing." Simultaneously, Davey opened accounts at Huntington National Bank under the name "Safe Harbor Wealth Investments, Inc.," presumably for the operation of unrelated businesses, and at Park National Bank under the name "Safe Harbor Investments, Inc.," for use by several of the entities in the Davey Common Enterprise, Relief Defendant Shiloh Estate, and other unrelated Davey businesses. By the time Davey's Fifth Third account

was closed in October 2009, Davey had begun using the Huntington and Park National bank accounts for his administration of the Black Diamond-related funds.

## B. Defendants' Concealment of the Fraud Through False Account Statements and Misrepresentations

### 1. Simmons' Admissions of No Trading by Black Diamond

83.     In written responses to a Commission subpoena on an unrelated matter, Simmons admitted Black Diamond "has never traded currency, held brokerage accounts, or advised anyone on currency trades."

84.     In his responses to the subpoena, Simmons further claimed Black Diamond only researched and monitored forex trading programs to find one to purchase and utilized hypothetical trading results to calculate the gains customers were supposedly making on their investments.

85.     Simmons and the other Defendants did not disclose these facts to Black Diamond customers, who instead believed the gains shown on their account statements were based on actual forex trading by Black Diamond and not estimated hypothetical trades. Indeed, these facts contradicted the Black Diamond promotional material used by Defendants which claimed the published results from its three year trading history represented "actual trading results not hypothetical or from back testing [sic]."

86.     On December 9, 2009, Simmons gave a written statement to the FBI in which he confirmed what he previously wrote the CFTC. In this statement, Simmons admitted that while he intended to invest Black Diamond customer money in forex, he never found a suitable platform to make such an investment and never traded forex with any money he received from Black Diamond customers.

2.    **Concealment of the Fraud through False Account Statements**

87.    Black Diamond, Simmons, Salazar, Coats and Davey, knowingly or recklessly through false representations, statements and/or omissions to customers, concealed the lack of trading and misappropriation of funds by providing oral and written reassurances to customers that Black Diamond was actually and profitably trading forex with customer funds.

88.    Simmons caused to be issued through Salazar, Coats, Davey and other Black Diamond agents false monthly account statements or reports of account performance to customers consistently showing overwhelmingly positive returns from their alleged forex trading.  In fact, Black Diamond never reported a losing month.

89.    The account statements issued to all customers, which were distributed interchangeably under the heading of BD Holdings and/or BDCS, reported the net gains earned on the allegedly profitable trading after BD Holdings owner gains, as well as any Facilitator share of the gains were subtracted.  Because Black Diamond did not actually perform any trading whatsoever, the gains subtracted and reported were based upon wholly fictitious profits.

90.    Simmons, Salazar, Coats and Davey prepared or reviewed some or all of these account statements before issuing them to customers; then delivered, or caused to be delivered, and or reported the results, of such statements to their customers.  Simmons, Salazar, Coats and Davey knowingly or recklessly issued, or caused to be issued, the false account statements to customers.

91.    Relying on the consistently profitable monthly account statements, existing customers decided to remain invested and, in some cases, invested additional funds through Simmons, Salazar, Coats and Davey.  Additionally, prospective customers made the decision to

26

invest in forex trading through Black Diamond through Simmons, Salazar, Coats and Davey after hearing of the consistently profitable monthly returns to existing customers.

**3.    Concealment of the Fraud as the Ponzi Scheme Starts Falling Apart**

92.    By early 2009, Black Diamond and Simmons had insufficient funds to continue paying out customer withdrawal requests. Despite their lack of trading and lack of funds to meet customer demands, Black Diamond and Simmons continued to accept, and Salazar, Coats and Davey continued to send, or caused to be sent in on behalf of their customers, additional funds from current customers as well as funds from new customers in an apparent effort to keep the fraudulent scheme going.

93.    On March 19, 2009, Simmons sent an email to Salazar and Coats claiming to them that Black Diamond would be shutting down for restructuring and, therefore, would be liquidating all customer accounts. In the email, Simmons also stated that all accounts, including all forex trading gains, would be paid out. This statement was false as, at that point, there was only approximately $600,000 remaining in the Black Diamond bank accounts. By the end of April 2009, when Simmons admitted there had never been any forex trading, less than $200,000 remained in the Black Diamond bank accounts.

94.    The alleged plan for restructuring was the first in a series of excuses created by Simmons, which were knowingly or recklessly repeated by Salazar, Coats and Davey to their customers to explain their failure to return funds to customers. These excuses included, but were not limited to, claims that: (1) the restructuring of Black Diamond required several accounting reviews and multiple paymasters and accountants before funds could be returned; (2) excessive withdrawal requests by customers were causing delays in the return of funds; (3) a non-existent German liquidity provider by the name of Klaus was attempting to provide $120 million to Black

27

Diamond to payout customers and replace Black Diamond on the purported platform, but his alleged transfer of funds was frozen by bank or regulatory procedures; (4) other bank interventions, such as banking requirements and restrictions, caused the Black Diamond accounts to be frozen; and (5) regulatory interventions by the Federal Reserve, the Treasury Department and the Commission, for reasons unrelated to the operations of Black Diamond, purportedly resulted in the freezing of their funds.

95. The failure to return funds and the continually evolving excuses persisted from March 2009 until Simmons was arrested on December 17, 2009.

96. Throughout this time, Simmons, Salazar, Coats and Davey continued to issue, or caused to be issued, to Black Diamond customers monthly account statements through November 2009 showing profitable results from Black Diamond's alleged forex trading.

97. Even as the excuses propounded by Simmons became more complex and outrageous, Salazar, Coats, and Davey continued to forward these excuses to Black Diamond customers as if they were their own or as if they had full knowledge of what was alleged in the excuses. Salazar, Coats and Davey knew or recklessly failed to ascertain the cause of the funding problem at Black Diamond, while perpetuating the stories and fabrications from Simmons as their own in communications with their customers.

98. Salazar and Coats, for example, made numerous assurances to their customers and the Hedge Fund Managers that a payout by Black Diamond would occur, resulting in a full return to customers of their principal and interest from their Black Diamond investment. In fact, Salazar, in an instant message exchange with Simmons in July 2009, worked with Simmons to draft the excuse they would provide to customers regarding the closing of Black Diamond and the unavailability of funds for withdrawals.

28

99.     Coats also worked with Simmons on an excuse he subsequently provided to his GWP limited partners. Coats, after consulting with Simmons, wrote in an email to GWP limited partners dated June 6, 2009, that the withdrawal of funds had been delayed due to the economic downturn and "stricter capital requirements imposed on our banking system," but assured GWP limited partners a complaint had been filed with the North Carolina State Banking Commission. These statements were false. Assurances such as these by Salazar and Coats continued until Simmons' arrest in December 2009.

100.    For his part, Davey informed the Hedge Fund Managers that $16 million was transferred into the Black Diamond account for the purposes of a customer payout due to the restructuring of Black Diamond but that those funds had been frozen by the Federal Reserve, thus causing Simmons to complete anti-money laundering forms before the funds could be unfrozen. These statements were also false.

101.    Davey also knowingly made affirmative misrepresentations to customers concerning the status of the bank accounts which held Black Diamond customer funds and which Davey controlled through the Davey Common Enterprise. National City Bank, JPMorgan Chase Bank and Fifth Third Bank each successively closed the Davey Common Enterprise bank accounts, causing Davey to continuously move the funds to new banks.

102.    In one instance, the bank notified Davey that the basis for terminating the accounts was because the accounts represented too great a risk for the bank. Davey misrepresented to his customers and the Hedge Fund Managers the true reason for the closing of the National City and JPMorgan Chase bank accounts, claiming that he chose to change banks on his own accord, rather than disclosing that the termination of the accounts had been forced by the

29

banks. For example, in one email dated May 12, 2009, Davey falsely stated he was closing the

JPMorgan Chase accounts because of "a notable decline in services."

103. Simmons and Coats warned customers against attempting to interfere in the

payout process or speaking to any financial regulators. Simmons threatened certain customers

that if they contacted the alleged paymaster, Black Diamond would lose access to the paymaster

services and the payout to customers would be jeopardized.

104. In an April 2009 email regarding the restructuring of Black Diamond, Coats

specifically warned the limited partners of GWP that the Commission was "randomly calling all

Forex ... clients across America to try and identify possible Madoff scams" and it was his

"suggestion" that GWP members not have any discussions with the Commission. At the time,

Coats was aware that Black Diamond was refusing to return customer funds or honor withdrawal

requests.

105. Simmons also provided to certain customers a list of real estate investments,

claiming that these properties were security for the funds allegedly being traded in forex through

Black Diamond. Simmons failed to disclose to these customers that these properties were

purchased with misappropriated Black Diamond customer funds and the value of the real estate

listed was insufficient to be adequate security for the funds sent in to Black Diamond, let alone

any of the alleged forex trading gains.

106. To further conceal and perpetuate the fraud and ease customer concerns, Simmons

falsely informed certain customers on several occasions that Black Diamond held approximately

$77 million in U.S. Treasury Notes in an account at JPMorgan Chase Bank. Simmons attempted

to prove the existence of the $77 million by altering a JPMorgan Chase bank document from an

account belonging to another entity (not owned by Simmons) to reflect this fictitious balance of $77 million. In fact, Black Diamond and Simmons held no such account at JPMorgan Chase.

107. Despite the complete lack of trading and more than eight months of delays in returning the unaccounted-for funds, Simmons, Salazar, Coats and Davey still claimed to Black Diamond customers, through at least December 2009, that their funds would be returned. These statements were false.

108. Simmons, Salazar, Coats and Davey also continued to issue customer account statements through at least November 2009, still showing significant profits in their accounts from the alleged forex trading, even while these Defendants were aware there were substantial problems in fulfilling customers' withdrawal requests.

109. Salazar, Coats and Davey continued to solicit customers to invest in forex through Black Diamond, and Black Diamond and Simmons continued to accept customer funds for investment in forex through Black Diamond through at least the summer of 2009.

110. Salazar, Coats and Davey additionally continued to charge their customers owner gains and management fees on Black Diamond trading gains purportedly earned through November 2009.

111. Customers have not been able to withdraw either their funds or terminate their trading accounts as promised in the Black Diamond Agreement, and have not received adequate explanations regarding the location of their funds.

## C. Defendants' Misappropriation and Misuse of Customer Funds

112. Simmons never engaged in any trading of forex on behalf of Black Diamond customers. In fact, the so-called system developers and the Black Diamond trading platform never existed.

113.    Instead of investing their money into a forex trading platform operated by Black Diamond as promised, Simmons misappropriated customer funds to pay purported profits or return principal to Black Diamond customers.  These payments accounted for at least half of the money brought in to Black Diamond, or approximately $19 million.

114.    Simmons also used at least $5.8 million in Black Diamond funds for cash withdrawals or to finance personal expenses for such things as real estate purchases and improvements, cars and lavish trips.

115.    Simmons also used at least $2 million of Black Diamond customer money to start, advertise, and operate several side businesses, including, but not limited to, Relief Defendants Eco-Green, Black Diamond Associates, High South and Gallery Group.  These side businesses were unrelated to the forex trading purportedly taking place through Black Diamond, and although they provided no services to Black Diamond, these side businesses were funded partially or almost entirely by customer money.  Therefore, these Relief Defendants received funds of Black Diamond defrauded customers to which they had no legitimate interest or entitlement.

116.    Salazar's customers invested more than $7 million for the purpose of trading forex through Black Diamond.

117.    Of the more than $2 million Salazar received directly from customers, Salazar failed to send to Black Diamond approximately $1.5 million.  Instead, she made or caused to be made bookkeeping transactions representing these customer deposits, with no actual transfer of funds taking place, keeping the actual funds for her personal use.

32

118.     Additionally, Salazar received more than $1.9 million in customer funds from Black Diamond, returned approximately $600,000 to customers, and kept the remaining $1.3 million for her personal use.

119.     Salazar used the approximately $2.8 million in misappropriated Black Diamond customer funds for, among other things, expensive personal trips and the purchase of more than $400,000 worth of vehicles.

120.     Additionally, Relief Defendant L. Salazar withdrew Black Diamond customer funds from his joint bank accounts with Salazar for personal use.  L. Salazar provided no services to Salazar customers in exchange for his use of these funds.  Therefore, L. Salazar had no legitimate interest or entitlement to these funds.

121.     The Hedge Funds and GWP customers brought in by Coats invested more than $27 million for the purpose of trading forex through Black Diamond.  Coats withdrew, as purported management fees and/or owner gains, over $400,000 of Black Diamond customer funds, approximately $200,000 of which was withdrawn after he knew Black Diamond had begun refusing to return funds to or honor withdrawals sought by customers.  These funds were deposited into bank accounts in the name of Relief Defendants Coats Estate, Inc. and Coats Wealth, from which Coats used these funds for personal expenses, including, among other things, the lease of an expensive vehicle, home improvements, maid services and a skydiving trip.

122.     Beginning in August 2008, Davey used more than $1.3 million in funds he withdrew from Divine Ltd.'s Black Diamond trading account to make a series of purported "loans" to Relief Defendant Sovereign Grace, which he controls.  Davey, acting through Sovereign Grace, then "loaned" the money to Relief Defendant Shiloh Estate, which Davey also

controlled at the time. Davey, through Shiloh Estate, used the customer money for the purpose of purchasing approximately 47 acres of land and constructing a lavish home. Davey purportedly intended to use this home as his principal residence. Prior to Simmons's arrest, Davey never informed the Divine Ltd. customers of these "loans," and neither Shiloh Estate nor Sovereign Grace made any principal or interest payments to Divine Ltd. customers on the alleged "loans." Sovereign Grace and Shiloh Estate provided no services to Divine Ltd. in exchange for their use of these funds. Therefore, these Relief Defendants received funds of Black Diamond defrauded customers to which they had no legitimate interest or entitlement.

123.    Even months after Black Diamond was unable to make any customer payouts, Salazar, Coats and Davey knowingly, or with reckless disregard, continued to accept, or caused to be accepted, additional funds for investment in Black Diamond and never sent, or caused to be sent, those funds to Black Diamond for forex trading. Instead Salazar, Coats and Davey each kept, or caused to be kept, those funds on deposit in bank accounts and did not inform their customers of this fact.

124.    For example, during the summer of 2009, Salazar took in approximately $130,000 in customer deposits intended for the purpose of trading forex through Black Diamond. Salazar never sent these funds to Black Diamond; instead, the funds were used to pay her personal expenses as well as a $50,000 cash withdrawal by Relief Defendant L. Salazar.

125.    In July 2009, more than three months after the Black Diamond payout problems began, Coats accepted at least $110,000 from a customer for trading forex through Black Diamond. Coats directed Davey to keep the funds in the administration bank account instead of sending the funds to Black Diamond. Coats used this customer's funds to make payments to an earlier customer and for payments to the Davey Common Enterprise.

126. Likewise, in August 2009, more than four months after the Black Diamond payout problems began, Davey accepted at least $200,000 deposited by a customer for trading forex through Black Diamond. Davey did not use those funds as the customer intended, but instead used the funds to make payments to earlier customers.

127. At no time did Black Diamond or Simmons ever have sufficient funds to repay customers their principal and purported gains.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

**Violations of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C)**
**(Fraudulent Solicitation, Misappropriation and False Statements)**

128. The allegations set forth in paragraphs 1 through 127 are realleged and incorporated herein by reference.

129. Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C), make it unlawful

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for or, in the case of paragraph (2), with the other person.

Pursuant to Section 2(c)(2)(C)(iv) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 2(c)(2)(C)(iv), Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, apply to

Defendants' foreign currency transactions "as if" they were a contract of sale of a commodity for future delivery.

130. As set forth above, from at least June 18, 2008, through the present, in or in connection with foreign currency contracts, made, or to be made, for or on behalf of, or with, other persons, Defendants cheated or defrauded, or attempted to cheat or defraud, customers or prospective customers; willfully made or caused to be made false reports or statements to another person; willfully deceived or attempted to deceive customers or prospective customers by, among other things, knowingly or recklessly (i) fraudulently soliciting customers and prospective customers to trade forex through Black Diamond by, among other things, falsely claiming average returns exceeding four percent per month and a one hundred percent success rate (i.e., never a losing month); (ii) minimizing and failing to fully disclose the risks of trading leveraged forex; (iii) misrepresenting forex trading activity that purportedly occurred on behalf of Defendants' customers, as well as purported returns the customers would and did receive on their forex investments; (iv) misappropriating customer funds for personal use; (v) failing to disclose that Defendants were operating a Ponzi scheme and misappropriating customer funds; (vi) making and/or causing to be made and distributing statements to Defendants' customers that contained false account values, false returns on investment and other false misinformation; and (vii) misrepresenting that Defendants had sufficient funds on hand to return all customers' principal, all in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

131. Defendants, by and through their agents, engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

132.     The foregoing acts, misrepresentations, omissions, and failures of Simmons

occurred within the scope of his employment, office or agency with BDCS; therefore, BDCS is

liable for these acts, misrepresentations, omissions, and failures pursuant to Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

133.     The foregoing acts, misrepresentations, omissions, and failures of Salazar

occurred within the scope of her employment, office or agency with Life Plus; therefore, Life

Plus is liable for these acts, misrepresentations, omissions, and failures pursuant to Section

2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

134.     The foregoing acts, misrepresentations, omissions, and failures of Coats occurred

within the scope of his employment, office or agency with GWM; therefore, GWM is liable for

these acts, misrepresentations, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act,

7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

135.     The foregoing acts, misrepresentations, omissions, and failures of Simmons,

Salazar and Coats occurred within the scope of their employment, office or agency with BD

Holdings; therefore, BD Holdings is liable for these acts, misrepresentations, omissions, and

failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation

1.2, 17 C.F.R. § 1.2 (2010).

136.     Simmons is a controlling person of BDCS and BD Holdings and failed to act in

good faith or knowingly induced, directly or indirectly, the acts constituting the violations.

Simmons is therefore liable for BDCS and BD Holdings' violations of the Act, pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

137.     Salazar is a controlling person of BD Holdings and Life Plus and failed to act in

good faith or knowingly induced, directly or indirectly, the acts constituting the violations.

Salazar is therefore liable for BD Holdings and Life Plus's violations of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

138.     Coats is a controlling person of BD Holdings and GWM and failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations. Coats is therefore liable for BD Holdings and GWM's violations of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

139.     The foregoing acts, misrepresentations, omissions, and failures of Davey occurred within the scope of his employment, office or agency with Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW; therefore, Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW are liable for these acts, misrepresentations, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

140.     Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW operated as a common enterprise with each other, and therefore are jointly and severally liable for the acts and omissions of one another.

141.     Davey is a controlling person of Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW and failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations. Davey is therefore liable for Divine L.L.C., SHV, SHWII, Divine Stewardship and SHW's violations of the Act, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

142.     Salazar, Coats and Davey willfully aided, abetted, counseled, commanded, induced or procured the commission of violations of the Act, or acted in combination or in concert with BD Holdings, BDCS and Simmons, or willfully caused acts to be done or omitted which, when directly performed or omitted, constituted BD Holdings, BDCS and Simmons's

violations of the Act. Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Salazar, Coats and Davey therefore violated Sections 4b(a)(2)(A)-(C) of the Act.

143.    Each act of misappropriation, misrepresentation or omission of material facts, and making or causing to be made a false report or statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C).

## COUNT TWO

### Disgorgement of Funds from the Relief Defendants

144.    Paragraphs 1 through 127 are re-alleged and incorporated herein.

145.    Defendants have defrauded the customers they solicited to invest in Black Diamond.

146.    The Relief Defendants L. Salazar, Eco-Green, Black Diamond Associates, High South, The Gallery Group, Coats Estate, Inc., Coats Wealth, Sovereign Grace and Shiloh Estate received funds as a result of the Defendants' fraudulent conduct and have been unjustly enriched thereby.

147.    Relief Defendants have no legitimate entitlement to or interest in all of the funds received as a result of the Defendants' fraudulent conduct.

148.    Relief Defendants should be required to disgorge funds up to the amount they received from Defendants' fraudulent conduct or the value of those funds that they may have subsequently transferred to third parties.

## VI.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers, enter:

a)     An order finding that Defendants violated Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C);

b)     An order of permanent injunction prohibiting Defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with any Defendant, including any successor thereof, from engaging, directly or indirectly:

 (i) in conduct in violation of Sections 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 6b(a)(2)(A)-(C); and

 (ii) trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006));

 (iii) entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2010)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

 (iv) having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

 (v) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

(vi)     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

(vii)    applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010);

(viii)   acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010);

c)      An order directing Defendants and Relief Defendants, as well as any successors to any Defendant or Relief Defendant, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

d)      An order directing Defendants to make full restitution to every person or entity whose funds Defendants received or caused another person or entity to receive as a result of acts and practices that constituted violations of the Act, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

e)      An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or

41

express, entered into between them and any of the customers whose funds were received by them as a result of the acts and practices which constituted violations of the Act, as described herein;

f)        An order directing each Defendant to pay a civil monetary penalty for each violation of the Act described herein, plus post-judgment interest, in the amount of the higher of: $140,000 for each violation of the Act committed on or after October 23, 2008; $130,000 for each violation of the Act committed on or between October 23, 2004 and October 22, 2008; or triple the monetary gain to each Defendant for each violation of the Act described herein, plus post-judgment interest;

g)        An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

h)        Such other and further relief as the Court deems proper.

Respectfully submitted by,

_____
Alan Edelman
Senior Trial Attorney
Anne M. Termine
Chief Trial Attorney
James H. Holl, III
Chief Trial Attorney
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: 202-418-5000
Facsimile: 202-418-5538
E-mail: aedelman@cftc.gov; atermine@cftc.gov; jholl@cftc.gov
Attorneys for Plaintiff
U.S. Commodity Futures Trading Commission

Dated: January 13, 2011

42