UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:11-cv-23-RJC-DCK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) ) | ORDER |
| KEITH E. SIMMONS et al., ) ) | |
| Defendants, and ) ) | |
| LAWRENCE SALAZAR, et al., ) ) | |
| Relief Defendants. ) ) | |

**THIS MATTER** comes before the Court on Defendants Jonathan Davey ("Davey") and Divine Circulation Services, LLC's ("DCS," collectively with Davey, "Defendants") Motion for Relief from Consent Order to Permit Distribution of Recovered Funds to DCS Shareholders. (Doc. No. 81). Plaintiff U.S. Commodity Futures Trading Commission ("Plaintiff") opposes the motion, (Doc. No. 84), and moves the Court for an Order to Show Cause as to Why Defendants Should Not be Held in Contempt of Court and an Order Holding Defendants in Contempt of Court for their actions related to these recovered funds, (Doc. No. 83). Plaintiff's motion pertains to this Court's February 11, 2011 Statutory Restraining Order ("SRO"). (Doc. No. 47).

I.     **BACKGROUND**

Plaintiff alleges that Defendants helped orchestrate a "$35 million foreign currency 'Ponzi' style fraudulent scheme." (Doc. No. 1 at 2). The scheme itself is alleged to have centered around several entities named Black Diamond. (Id.). On February 11, 2011, this Court entered its SRO, restraining Defendants from, *inter alia*, transferring any assets they held then or

thereafter acquired. (Doc. No. 47 at 4-5). The SRO also required Defendants to transfer all their assets to the United States. (Id. at 6-7). The present dispute concerns $3,644,708 that DCS recovered from litigation in Europe in July 2011. (Doc. No. 81 at 6). DCS is currently holding this money in its European counsel Citilegal's trust account. (Doc. No. 81-3 at 2).

"DCS was formed in 2007 to make and manage hedge fund investments." (Doc. No. 81 at 3). Forty-seven shareholders invested their funds in the company. (Id.). DCS, in turn, invested these funds in four ventures: (1) Mexbank; (2) Black Diamond (the alleged Ponzi scheme); (3) Audience Alliance; and (4) Amkel Corporation. (Id. at 3-4).

DCS invested $4,000,000 in Amkel in October 2008. (Id. at 4). $3,324,000 of this amount was withdrawn from DCS's investment with Black Diamond. (Id.). The remainder came directly from DCS's shareholders. (Id.). DCS argues that because it had earlier invested $3,743,987.41 in Black Diamond, none of the money it withdrew to invest in Amkel came from Black Diamond's illicit profits. (Id. at 5).

Amkel also turned out to be a problematic investment. In early 2009, DCS learned that Amkel's manager, Patrick Danison, had been arrested. (Id. at 4). DCS began litigation across Europe to try to recover its investment. (Id.). DCS has been successful in this pursuit and has recently recovered the $3,644,708 discussed above. (Id. at 6). But DCS argues that this money belongs to its shareholders and should not be subject to this Court's asset freeze. (Id.).

## II. ANALYSIS

### A. Defendant's Motion for Relief

DCS's recovery from its maligned Amkel investment falls within the scope of this Court's SRO. This Court's SRO prohibits DCS from transferring any cash it acquires. (Doc. No. 47 at 5). The money DCS recovered in Europe belongs to DCS. Thus it falls squarely

2

within the SRO.

DCS argues that the money is not traceable to any ill gotten gains because it invested more than it withdrew from Black Diamond. (Doc. No. 81 at 7). Plaintiff responds that Black Diamond had only $4 million in assets to cover its $15 million in obligations at that time, and thus, Black Diamond must have used the funds from its victims to satisfy DCS's withdrawal request. (Doc. No. 84 at 3). The Court need not address this issue because the Court did not freeze only those assets traceable to Black Diamond's illicit profits. (Doc. No. 47 at 4-5). The Court froze all of DCS's assets because it found that Plaintiff's allegations against it were supported by good cause and freezing DCS's assets was necessary to assure restitution to Defendants' alleged victims. (Id. at 2, 4-5). This Court also found "good cause to believe that immediate and irreparable damage to the Court's ability to grant effective relief for customers in the form of monetary redress will occur from the . . . transfer . . . by Defendants . . . of assets or records unless Defendants . . . are immediately restrained and enjoined." (Id.). This rationale supports freezing DCS's $3,644,708 recovery.

These funds currently belong to DCS, not its shareholders. DCS may be liable to Plaintiff in amounts in excess of $3,644,708. See (Doc. No. 1 at 39-42). The Court finds that it may be unable to grant effective relief to Defendants' alleged victims should DCS be permitted to instead transfer this amount to its shareholders. Defendants' Motion for Relief from Consent Order to Permit Distribution of Recovered Funds to DCS Shareholders, (Doc. No. 81), is **DENIED**.

B.  Plaintiff's Motion for Contempt

Plaintiff moves the Court to order Defendants to show cause why they should not be held in contempt for violating this Court's SRO. (Doc. No. 83). Plaintiff argues that Defendants

violated the provision of the SRO which required Defendants to repatriate their foreign assets. (Id. at 2); see also (Doc. No. 47 at 6-7). This Court's SRO required Defendants to "[t]ransfer to the territory of the United States all of Defendants' . . . Assets (other than real property) and documents located outside the United States." (Doc. No. 47 at 6-7). But unlike the SRO's freeze provision that prohibited Defendants from transferring "both existing Assets and Assets acquired after the effective date of this Order," the repatriation requirement did not explicitly refer to after acquired property. (Id. at 5-7). The Court hereby clarifies that both requirements apply to "existing Assets and Assets acquired after the effective date of this Order."[1]

Because of this ambiguity and Defendants' good faith efforts in notifying this Court of its receipt of $3,644,708 in Assets and its depositing of those funds in its counsel's trust account, this Court declines to order Defendant to show cause why they should not be held in contempt. Plaintiff's motion is **DENIED**.

The Court orders Defendants to immediately transfer the $3,644,708 in its counsel's trust account to the territory of the United States. These funds are subject to the Court's freeze. Further, Plaintiff must file proof that it has deposited this amount in a frozen United States account within thirty (30) days of the date of this Order. Defendants' failure to repatriate its $3,644,708 recovery will result in heavy sanctions.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Relief from Consent Order to Permit Distribution of Recovered Funds to DCS Shareholders, (Doc. No. 81), is **DENIED**;

2. Plaintiff's Motion for an Order to Show Cause as to Why Defendants Should Not

---

[1] "Assets" is a term defined by the Court's Statutory Restraining Order. (Doc. No. 47 at 4). That specialized meaning is incorporated into this Order.

be Held in Contempt of Court and an Order Holding Defendants in Contempt of Court for their actions related to these recovered funds, (Doc. No. 83), is **DENIED**;

3. The provision of this Court's Statutory Restraining Order requiring the repatriation of all the defendants' assets applies to both existing Assets and Assets acquired after the effective date of this Order; and

4. The Court orders Defendants to transfer the $3,644,708 it is holding in Citilegal's trust account, <u>see</u> (Doc. No. 81-3), to the territory of the United States and file proof of compliance within thirty (30) days of the date of this Order.

Signed: November 14, 2011

Robert J. Conrad, Jr.
Chief United States District Judge