# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CASE NO. 3:11-cv-00023-RJC-DCK

U.S. COMMODITY FUTURES TRADING
COMMISSION,

Plaintiff,

v.

KEITH F. SIMMONS, et al.,

Defendants, and

LAWRENCE SALAZAR, et al.,

Relief Defendants.

**FILED**
CHARLOTTE, NC

SEP 1 8 2017

US District Court
Western District of NC

## ORDER FOR ENTRY OF DEFAULT JUDGMENT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND ANCILLARY EQUITABLE RELIEF AGAINST DEFENDANTS GENESIS WEALTH MANAGEMENT, LLC, DIVINE CIRCULATION SERVICES, LLC, DIVINE STEWARDSHIP, LLC, SAFE HARBOR VENTURES, INC., SAFE HARBOR WEALTH INVESTMENTS, INC., AND SAFE HARBOR WEALTH, INC., AND RELIEF DEFENDANTS BLACK DIAMOND ASSOCIATES, LLC, COATS ESTATE PLANNING SERVICES, INC., COATS WEALTH MANAGEMENT, INC., ECO-GREEN, LLC, THE GALLERY GROUP, LLC, HIGH SOUTH REALTY, LLC, AND SOVEREIGN GRACE, INC.

On January 13, 2011, the United States Commodity Futures Trading Commission ("CFTC") filed its Complaint in the above-captioned action against Defendants Keith Simmons ("Simmons"), Black Diamond Capital Solutions, L.L.C. ( "BDCS"), Black Diamond Holdings L.L.C. ( "BDH"), Deanna Salazar ("Salazar"), Life Plus Group, L.L.C. ("LPG"), Bryan Coats ("Coats"), Jonathan Davey ( "Davey"),Genesis Wealth Management, LLC ("GWM"), Divine Circulation Services, LLC ("DCS"), Divine Stewardship, LLC ("Divine Stewardship"), Safe Harbor Ventures, Inc. ("SHV"), Safe Harbor Wealth Investments, Inc. ("SHWI"), and Safe

1

Harbor Wealth, Inc. ("SHW"), and Relief Defendants Black Diamond Associates, LLC ("Black Diamond Associates"), Coats Estate Planning Services, Inc. ("Coats Estate"), Coats Wealth Management, Inc. ("Coats Wealth"), Eco-Green, LLC ("Eco-Green"), The Gallery Group, LLC ("Gallery Group") High South Realty, LLC ("High South"), Lawrence Salazar ("L. Salazar"), Shiloh Estate, LLC ("Shiloh"), and Sovereign Grace, Inc. ("Sovereign Grace") seeking injunctive and other equitable relief for violations of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 1 *et seq.* (2012) (Dkt. #1). The Complaint alleges that from at least April 2007, and continuing until the time of the Complaint (the "Relevant Period"), Defendants Simmons, Salazar, Coats, and Davey, acting through the various corporate Defendants, fraudulently solicited and/or accepted at least $35 million from at least 240 individuals or entities for the purported purpose of trading, via the Black Diamond trading platform, a pooled investment in connection with agreements, contracts, or transactions in off-exchange foreign currency ("forex") that are margined or leveraged. Specifically, the CFTC's Complaint charges that Defendants violated 7 U.S.C. §§ 6b(a)(2)(A)-(C) (2012). The Complaint also alleges that Relief Defendants, who are not charged with violations of the Act and/or Regulations, received funds and assets from Defendants to which they hold no legitimate interest or entitlement and which were derived from Defendants' fraudulent and violative acts.

On February 15, 2011, Defendant GWM and Relief Defendants Coats Estate and Coats Wealth (collectively, the "Coats Entities") through their counsel Joseph Nanny, filed an answer to the CFTC's Complaint (Dkt. # 51). On March 18, 2011, Defendants DCS, Divine Stewardship, SHV, SHW, and SHWI, and Relief Defendant Sovereign Grace (collectively, the "Davey Entities"), through their counsel E. Fitzgerald Parnell, III and Joseph E. Zeszotarski, Jr., filed an answer to the CFTC's Complaint (Dkt. # 70).

On March 15, 2011, the Court stayed all discovery in this case pending a parallel criminal investigation by the United States (Dkt. #69). During the pendency of the discovery stay, both counsel for the Davey Entities and counsel for the Coats Entities filed motions to withdraw from representing their respective clients (Dkt. #'s 97, 118). The Court granted these motions (Dkt. #'s 98, 125). In its order regarding the Coats Entities, the Court noted that it "expresses no opinion as to the status of Defendants Genesis Wealth Management, LLC, Coats Estate Planning Services, Inc., and Coats Wealth Management, Inc. in this matter; however, to the extent those entities exist and remain defendants in this matter, they are required to immediately retain licensed counsel." (Dkt. #125, at 2.) The Court cited case law for the proposition that corporations may appear in federal court only through licensed counsel. *Id.*

On June 24, 2015, upon motion by the CFTC, the Court lifted the discovery stay (Dkt. # 130). With no attorney having appeared on behalf of any of the Coats Entities or the Davey Entities, the CFTC moved for entry of default against the Coats Entities and the Davey Entities on September 19, 2016 (Dkt. #150). The Court granted the CFTC's motion and defaults were entered against the Coats Entities and the Davey Entities on October 24, 2016 (Dkt. #151).

Relief Defendants Black Diamond Associates, Eco-Green, Gallery Group, and High South (collectively, the "Simmons Entities") were each served with a Summons and the Complaint on January 21, 2011 (Dkt. #'s 38, 41, 42, 43). Pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(a)(1)(A)(i), the Simmons Entities' Answers were due on or before February 11, 2011. The Simmons Entities failed to respond to the CFTC's within twenty-one (21) days of service. On February 8, 2017, the CFTC moved for entry of default against the Simmons Entities (Dkt. #166). The Court granted the CFTC's motion and defaults were entered against the Simmons Entities on March 29, 2017 (Dkt. #176).

On May 1, 2017, the CFTC filed a *Motion and Supporting Memorandum for Entry of Default Judgment, Permanent Injunction, Restitution, Civil Monetary Penalties, and Ancillary Equitable Relief Against Genesis Wealth Management, LLC, Divine Circulation Services, LLC, Divine Stewardship, LLC, Safe Harbor Ventures, Inc., Safe Harbor Wealth Investments, Inc., and Safe Harbor Wealth, Inc., and Relief Defendants Black Diamond Associates, LLC, Coats Estate Planning Services, Inc., Coats Wealth Management, Inc., Eco-Green, LLC, The Gallery Group, LLC, High South Realty, LLC, and Sovereign Grace, Inc.* ("Motion and Memorandum") pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 55(b). The Court has reviewed the CFTC's Complaint, the allegations of which are well-pleaded and hereby taken as true, the Motion and Memorandum, and the declarations and exhibits filed with the Court, and, being fully advised in the premises, hereby:

**GRANTS** the CFTC's Motion, enters the following Findings of Fact and Conclusions of Law relevant to the allegations in the CFTC's Complaint, and issues the following *Order for Entry of Default Judgment, Permanent Injunction, Restitution, Civil Monetary Penalties, and Ancillary Equitable Relief Against Defendants Genesis Wealth Management, LLC, Divine Circulation Services, LLC, Divine Stewardship, LLC, Safe Harbor Ventures, Inc., Safe Harbor Wealth Investments, Inc., and Safe Harbor Wealth, Inc., and Relief Defendants Black Diamond Associates, LLC, Coats Estate Planning Services, Inc., Coats Wealth Management, Inc., Eco-Green, LLC, The Gallery Group, LLC, High South Realty, LLC, and Sovereign Grace, Inc.* (hereinafter "Order").

## I.   FINDINGS OF FACT[1]

1.      Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 *et seq.* (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2016).

2      Defendant **Genesis Wealth Management, L.L.C.** ("GWM") is a Delaware Limited Liability Company organized in 2008.  GWM is wholly owned by Coats and is the general partner of **Genesis Wealth Partners LP** ("GWP"), a Delaware Limited Partnership.

3.      Defendant **Divine Circulation Services, L.L.C.** is an Ohio Limited Liability Company formed in 2007.  During the Relevant Period, DCS had its principal place of business at 35 South Park Place, Suite 10, Newark, Ohio 43055.  DCS is wholly owned by Safe Harbor Ventures, Inc.

4.      Defendant **Safe Harbor Ventures, Inc.** is a Delaware corporation formed in 2005.  During the Relevant Period, SHV had its principal place of business at 35 South Park Place, Suite 10, Newark, Ohio 43055.  SHV is owned by Shari Davey, the wife of Davey.

5.      Defendant **Safe Harbor Wealth Investments, Inc.** is an Ohio corporation formed in 2001.  During the Relevant Period, SHWII had its principal place of business at 35 South Park Place, Suite 10, Newark, Ohio 43055.

6.      Defendant **Divine Stewardship, L.L.C.,** is an Ohio corporation formed in May 2009.  During the Relevant Period, Divine Stewardship had its principal place of business at 35 South Park Place, Suite 10, Newark, Ohio 43055.

---

[1] The findings of fact and conclusions of law contained herein are directed at the Defaulted Defendants and Defaulted Relief Defendants named in the CFTC's Motion only, and are not intended to bind any other defendants or relief defendants to this action, or related third parties.

7.    Defendant **Safe Harbor Wealth, Inc.** is an Ohio corporation formed in 2000.
During the Relevant Period, SHW had its principal place of business at 35 South Park Place,
Suite 10, Newark, Ohio 43055.   SHW is a public accounting firm licensed in the State of Ohio.

8.    Relief Defendant **Black Diamond Associates, L.L.C.** is a North Carolina Limited
Liability Company formed in January 2008.  During the Relevant Period, BDA had a principal
place of business at 522 S. Main Street, West Jefferson, North Carolina 28640.

9.    Relief Defendant **Eco-Green, L.L.C.** is a North Carolina Limited Liability
Company formed in May 2008.  During the Relevant Period, Eco-Green had its principal place
of business at 19 E. Ashe St., West Jefferson, North Carolina 28694.

10.    Relief Defendant **The Gallery Group, L.L.C.** is a North Carolina Limited
Liability Company formed in June 2008.  During the Relevant Period, The Gallery Group had a
registered office address of 230 Hice Avenue, West Jefferson, North Carolina 28694.

11.    Relief Defendant **High South Realty, L.L.C.** is a North Carolina Limited
Liability Company formed in May 2007.  During the Relevant Period, High South Realty had a
principal place of business at 522 S. Main Street, West Jefferson, North Carolina 28640.

12.    Relief Defendant **Coats Estate Planning Services, Inc.** is a North Carolina
corporation formed in 2004.

13.    Relief Defendant **Coats Wealth Management, Inc.** is a North Carolina
corporation formed in 2008.

14.    Relief Defendant **Sovereign Grace, Inc.** is a Belize International Business
Company and was the owner and sole member of Shiloh Estate until January 2010.  Davey is the
beneficial owner of Sovereign Grace.

## A. Defendants Fraudulently Solicited Customers to Trade Forex through Black Diamond

15.     During the relevant period, Simmons, Salazar, Coats, and Davey, acting through the various corporate defendants, including the Defaulted Defendants, orchestrated a forex "Ponzi" style scheme by fraudulently solicited and/or accepting at least $35 million from at least 240 individuals or entities for the purported purpose of trading, via the Black Diamond trading platform, a pooled investment in connection with agreements, contracts, or transactions in off-exchange foreign currency ("forex") that are margined or leveraged. At least some of Defendants' customers, if not all, were individuals who each had total assets of less than $5 million.

16.     Simmons first solicited Salazar to invest in forex through BDCS in April 2007, and subsequently entered into a joint venture with Salazar whereby she, acting through her company Life Plus, would market forex trading through BDCS to her customers. Simmons and Salazar would then split equally the joint venture's share of profits achieved by any new customers brought to BDCS by Salazar. Simmons and Salazar subsequently solicited Coats to invest in forex through BDCS in October 2007, and then entered into a three-way joint venture with Coats whereby he, acting through his company Coats Estate, would market forex trading through BDCS to his customers. Simmons, Salazar, and Coats would then split in equal thirds the new joint venture's share of profits achieved by any new customers brought to BDCS by Coats. According to the Simmons-Salazar-Coats joint venture agreement, the joint venture was to be conducted under the name BDCS; but later Simmons, Salazar, and Coats changed the name to BD Holdings. Regardless, Simmons, Salazar, and Coats continued to use the names, BDCS, BD Holdings, and Black Diamond interchangeably in their forex materials, solicitations, and communications with customers.

17.     Simmons, Salazar, and Coats jointly developed Black Diamond solicitation materials and provided them to the persons and entities they solicited. The Black Diamond solicitation materials used by Simmons, Salazar, and Coats claimed that Black Diamond offered customers exclusive access to an automatic computerized trading system created by a group of software developers to trade forex, that the system had been trading forex for over 36 months, and that every month had exceeded the target of four percent gain per month. One version of the materials purported to show an actual three year trading history with consistently positive monthly returns, often in excess of ten percent, and a three year balance reflecting results of $194,340.37 on an initial $5,000 investment.

18.     The Black Diamond solicitation materials assured customers that the risk of trading forex through Black Diamond was limited because automatic stop loss mechanisms would kick in should a customer's account ever drop ten percent (or, in some later versions, twenty percent) and would prevent any further trading without specific instructions from the customer. In addition, the materials assured customers that Black Diamond had no right to deplete or withdraw customer funds at any time other than for the purpose of engaging in actual trading.

19.     To expand the reach of the Black Diamond scheme even farther, Salazar entered into "Co-Facilitator Agreements" with certain of her customers. These agreements authorized others – so-called "Facilitators" – to solicit customers to trade forex through BDCS in exchange for a marketing service fee. If a Facilitator successfully solicited a customer to trade through BDCS, then Simmons and Salazar would further divide their portion of the customer's trading profits with the referring Facilitator. As a result of these Co-Faciliator agreements, the Black

Diamond fraudulent scheme was extended to numerous individuals/entities across California, Colorado, Texas, and other states.

20. In addition to the Black Diamond solicitation material described above, Salazar, directly or through her Facilitators, provided customers with a one-page trading agreement to sign ("Black Diamond/Life Plus Membership Agreement"). The trading agreement provided that customers would participate with both BDCS and Life Plus in a forex trading account held by BDCS at a third party brokerage, and provided for a percentage split that varied by customer (usually ranging from 50/50 to 60/40) of net profits between the account holder and Black Diamond/Life Plus.

21. Coats initially solicited customers as a Facilitator for Salazar pursuant to the Simmons-Salazar joint venture. By December 2007, after the Simmons-Salazar-Coats joint venture was formed, Coats began soliciting customers to trade forex through Black Diamond pursuant to the joint venture agreement. By June 2008, Coats established his own hedge fund, Genesis Wealth Partners LP ("GWP"), with GWM as its general partner, to be the vehicle through which he solicited customers for Black Diamond. Coats's existing customers became limited partners of GWP. GWM earned management fees for its administration of GWP; these fees were often deposited into bank accounts in the name of Coats Wealth controlled by Coats. While GWP had its own trading accounts with Black Diamond, Coats also maintained a trading account in the name of Coats Estate, Inc. in order to collect his profit share under the joint venture agreement.

22. For his customers, Coats used the Black Diamond/Life Plus Membership Agreement, amended to reflect that customers were entering into a forex trading agreement with Black Diamond, Life Plus and Coats Estate, Inc., calling the three entities "BDFG" (the "BDFG

9

Membership Agreement"). No such company named BDFG existed; however, upon information and belief, BDFG was intended by Simmons, Salazar, and Coats in these agreements to mean the joint venture that was later formally incorporated as BD Holdings. Most, if not all, of Coats' customers signed the BDFG Membership Agreement. Coats also signed those agreements representing that he was an officer of the so-called BDFG. Many, if not most, of Coats' customers also completed an account information form wherein Coats's name appeared on the signature line identifying himself as an officer of BDFG.

23.     In December 2007, Coats solicited Defendant Davey to open a forex trading account with Black Diamond on behalf of the customers of his fund Divine Ltd. Davey signed the BDFG Membership Agreement and began sending Divine Ltd. funds to Black Diamond. Coats also recruited individuals to create and manage "Hedge Funds" in order to solicit additional customers for the Black Diamond scheme. As a result of these Hedge Funds, the Black Diamond fraudulent scheme was extended to numerous individuals/entities across the United States.

**B.      Defendants Misappropriated Customer Funds**

24.     Coats initially had his GWP customers and some of the Hedge Funds send their funds directly to bank accounts in the name of BDCS controlled by Simmons. By early 2009, however, Davey had become the "third party administrator" of GWP and the Hedge Funds' accounts with Black Diamond. To carry out this role, Davey utilized a system of interrelated companies, namely DCS, SHV, SHWI, Divine Stewardship, and SHW, which operated as a common enterprise (the "Davey Common Enterprise"). The various entities comprising the Davey Common Enterprise operated out of the same location, 35 South Park Place, Suite 10, Newark, Ohio, 43055, at times commingled funds, shared officers and owners, and were under

common control. Once Davey became the third party administrator, Coats instructed that all funds from GWP, DCS, and the Hedge Funds be sent to Black Diamond through various bank accounts controlled by the Davey Common Enterprise. SHV wholly owned DCS and managed, through DCS, the bank account responsible for sending customer funds, including those funds of Divine Ltd., GWP, and the other Hedge Funds, to Black Diamond. SHWI and/or Divine Stewardship provided administrative services to SHV in the management of the funds flowing through the Davey Common Enterprise to Black Diamond. SHW provided accounting services for the Davey Common Enterprise in its movement of funds to Black Diamond.

25. Simmons never engaged in any trading of forex on behalf of Black Diamond customers. In fact, the so-called system developers and the Black Diamond trading platform never existed. Instead of investing customer funds into a forex trading platform operated by Black Diamond as promised, Simmons misappropriated those funds to pay purported profits or return principal to Black Diamond customers. These payments accounted for at least half of the money brought in to Black Diamond, or approximately $19 million.

26. Simmons also used at least $5.8 million in Black Diamond funds for cash withdrawals or to finance personal expenses for such things as real estate purchases and improvements, cars and lavish trips. In addition, Simmons used at least $2 million of Black Diamond customer funds to start, advertise, and operate several side businesses, including, but not limited to, Relief Defendants Eco-Green, Black Diamond Associates, High South, and Gallery Group. These side businesses were unrelated to the forex trading purportedly taking place through Black Diamond, and although they provided no services to Black Diamond, these side businesses were funded partially or almost entirely by customer money.

27.     The Hedge Funds and GWP customers brought in by Coats invested more than $27 million for the purpose of trading forex through Black Diamond. Coats withdrew, as purported management fees and/or owner gains, over $400,000 of Black Diamond customer funds. Coats used these funds for personal expenses, including, among other things, the lease of an expensive vehicle, home improvements, maid services, and a skydiving trip.

28.     Beginning in August 2008, Davey used more than $1.3 million in funds he withdrew from Divine Ltd.'s Black Diamond trading account to make a series of purported "loans" to Relief Defendant Sovereign Grace, which he controls. Davey, acting through Sovereign Grace, then "loaned" the money to Relief Defendant Shiloh Estate, which Davey also controlled at the time. Davey, through Shiloh Estate, used the customer money for the purpose of purchasing approximately 47 acres of land and constructing a lavish home. Davey purportedly intended to use this home as his principal residence. Prior to Simmons's arrest in December 2009, Davey never informed the Divine Ltd. customers of these "loans," and neither Shiloh Estate nor Sovereign Grace made any principal or interest payments to Divine Ltd. customers on the alleged "loans." Sovereign Grace and Shiloh Estate provided no services to Divine Ltd. in exchange for their use of these funds.

## C.     Defendants Concealed Their Misappropriation With False Account Statements and Misrepresentations

29.     To conceal the lack of trading and the misappropriation of customer funds, Simmons caused to be issued through Salazar, Coats, Davey, and other Black Diamond agents false monthly account statements to customers consistently showing overwhelmingly positive returns from their alleged forex trading. In fact, Black Diamond never reported a losing month. Simmons, Salazar, Coats, and Davey prepared or reviewed some or all of these account statements before issuing them to customers; then delivered, or caused to be delivered, and/or

reported the results of such statements to their customers. Relying on the consistently profitable monthly account statements, existing customers decided to remain invested and, in some cases, invested additional funds through Simmons, Salazar, Coats, and Davey. Additionally, prospective customers made the decision to invest in forex trading through Black Diamond through Simmons, Salazar, Coats, and Davey after hearing of the consistently profitable monthly returns to existing customers.

30.    By early 2009, Black Diamond and Simmons had insufficient funds to continue paying out customer withdrawal requests. Despite their lack of trading and lack of funds to meet customer demands, Black Diamond and Simmons continued to accept, and Salazar, Coats, and Davey continued to send, or caused to be sent in on behalf of their customers, additional funds from current customers as well as funds from new customers in an apparent effort to keep the fraudulent scheme going.

31.    On March 19, 2009, Simmons sent an email to Salazar and Coats stating that Black Diamond would be shutting down for restructuring and, therefore, would be liquidating all customer accounts. In the email, Simmons also stated that all accounts, including all forex trading gains, would be paid out. At that point, however, there was only approximately $600,000 remaining in the Black Diamond bank accounts. The alleged plan for restructuring was the first in a series of excuses created by Simmons, which were repeated by (and, in some instances, crafted with the aid of) Salazar, Coats, and Davey to their customers to explain their failure to return funds to customers. These excuses included, but were not limited to, claims that: (1) the restructuring of Black Diamond required several accounting reviews and multiple paymasters and accountants before funds could be returned; (2) excessive withdrawal requests by customers were causing delays in the return of funds; (3) a non-existent German liquidity provider by the

13

name of Klaus was attempting to provide $120 million to Black Diamond to payout customers and replace Black Diamond on the purported platform, but his alleged transfer of funds was frozen by bank or regulatory procedures; (4) other bank interventions, such as banking requirements and restrictions, caused the Black Diamond accounts to be frozen; and (5) regulatory interventions by the Federal Reserve, the Treasury Department and the Commission, for reasons unrelated to the operations of Black Diamond, purportedly resulted in the freezing of their funds.

32.     Even as the excuses propounded by Simmons became more complex and outrageous, Salazar, Coats, and Davey continued to forward these excuses to Black Diamond customers as if they were their own or as if they had full knowledge of what was alleged in the excuses. Salazar and Coats, for example, made numerous assurances to their customers and the Hedge Fund Managers that a payout by Black Diamond would occur, resulting in a full return to customers of their principal and interest from their Black Diamond investment. Coats worked with Simmons on an excuse he subsequently provided to his GWP limited partners. After consulting with Simmons, Coats wrote in an email to GWP limited partners dated June 6, 2009, that the withdrawal of funds had been delayed due to the economic downturn and "stricter capital requirements imposed on our banking system," but assured GWP limited partners a complaint had been filed with the North Carolina State Banking Commission.

33.     For his part, Davey informed the Hedge Fund Managers that $16 million was transferred into the Black Diamond account for the purposes of a customer payout due to the restructuring of Black Diamond, but that those funds had been frozen by the Federal Reserve, thus causing Simmons to complete anti-money laundering forms before the funds could be unfrozen. Davey also misrepresented to customers the status of the bank accounts which held

14

Black Diamond customer funds and which Davey controlled through the Davey Common Enterprise.

34.     Simmons and Coats threatened customers with additional delays in fund distribution if they attempted to interfere in the payout process or spoke to any financial regulators. Simmons threatened certain customers that if they contacted the alleged paymaster, Black Diamond would lose access to the paymaster services and the payout to customers would be jeopardized. In an April 2009 email regarding the restructuring of Black Diamond, Coats specifically warned the limited partners of GWP that the Commission was "randomly calling all Forex … clients across America to try and identify possible Madoff scams" and it was his "suggestion" that GWP members not have any discussions with the Commission. At the time, Coats was aware that Black Diamond was refusing to return customer funds or honor withdrawal requests.

35.     Despite the complete lack of trading and more than eight months of delays in returning the unaccounted-for funds, Simmons, Salazar, Coats, and Davey still claimed to Black Diamond customers, through at least December 2009, that their funds would be returned. Throughout this time, Simmons, Salazar, Coats, and Davey continued to issue, or caused to be issued, to Black Diamond customers monthly account statements through November 2009 showing profitable results from Black Diamond's alleged forex trading.

**D.     Defendants Continued to Misappropriate Funds Even When They Knew Black Diamond Could Not Make Customer Payouts**

36.     Even months after Black Diamond was unable to make any customer payouts, Salazar, Coats, and Davey continued to accept additional funds for investment in Black Diamond and never sent, or caused to be sent, those funds to Black Diamond for forex trading. Instead, Salazar, Coats, and Davey each kept, or caused to be kept, those funds on deposit in bank

accounts and did not inform their customers of this fact. For example, in July 2009, more than three months after the Black Diamond payout problems had begun, Coats accepted at least $110,000 from a customer for trading forex through Black Diamond. Coats directed Davey to keep the funds in the administration bank account instead of sending the funds to Black Diamond. Coats used this customer's funds to make payments to earlier customers and for payments to the Davey Common Enterprise. Likewise, in August 2009, more than four months after the Black Diamond payout problems had begun, Davey accepted at least $200,000 deposited by a customer for trading forex through Black Diamond. Davey did not use those funds as the customer intended, but instead used the funds to make payments to earlier customers.

**E.   Relief Defendants Received Customer Funds to Which They Had No Legitimate Entitlement or Interest**

37.     Simmons used at least $2 million of Black Diamond customer money to start, advertise, and operate several side businesses, including, but not limited to, Relief Defendants Eco-Green, Black Diamond Associates, High South and Gallery Group. These side businesses were unrelated to the forex trading purportedly taking place through Black Diamond, and although they provided no services to Black Diamond, these side businesses were funded partially or almost entirely by customer money.

38.     Eco-Green was a "consulting and development business" focused on the environmentally-friendly or "green" design of buildings and was not a forex platform. Eco – Green was not the source of any funds deposited to the Black Diamond accounts; nevertheless, a total of $188,500 was paid directly from the Black Diamond accounts to Eco-Green. Eco-Green provided no goods or services to Black Diamond in exchange for the net payment of $188,500 it received.

39. Black Diamond Associates was a "commercial lending" business and was not a forex platform. Black Diamond Associates was not the source of any funds deposited to the Black Diamond accounts; nevertheless, a total of $1,065,972.83 was paid directly from the Black Diamond accounts to Black Diamond Associates. Black Diamond Associates provided no goods or services to Black Diamond in exchange for the net payment of $1,065,972.83 it received.

40. High South Realty was a "real estate franchise" and was not a forex platform. High South Realty deposited a total of $4,000 to the Black Diamond accounts; however, a total of $762,314.60 was paid directly from the Black Diamond accounts to four High South Realty accounts. High South Realty provided no goods or services to Black Diamond in exchange for the net payment of $758,314.60 it received.

41. The Gallery Group was a "public relations and marketing firm" and was not a forex platform. The Gallery Group was not the source of any funds deposited to the Black Diamond accounts; nevertheless, a total of $236,364 was paid directly from the Black Diamond accounts to The Gallery Group. The Gallery Group provided no goods or services to Black Diamond in exchange for the net payment of $236,364 it received.

42. Coats Estate was an insurance sales business, not a forex platform. Coats did use Coats Estate, however, to solicit customers to invest in Black Diamond pursuant to a joint venture agreement. According to the joint venture agreement, the payment to Coats Estate for soliciting these customers was to be one-third of the customers' net trading profits. Coats Estate also had a sub-account in its name at Black Diamond for forex investment into which it deposited $170,000. According to the sub-account agreement, Coats Estate was entitled to withdraw its principal from Black Diamond, and was also entitled to 60% of the "net" profits from forex trading. Coats, through a separate entity, also operated a "hedge fund" which had a

subaccount at Black Diamond separate from the Coats Estate sub-account. According to the terms of that hedge fund agreement, the General Partner, which was controlled by Coats, was entitled to 35% of the net trading profit earned.

43.    Coats Estate received $1,285,000 directly from the Black Diamond accounts. Of the $1,285,000 it received, Coats Estate received $765,000 as withdrawals of principal and/or purported gains from its sub-account or as payment of trading profits it purportedly earned pursuant to the joint venture agreement. Another $20,000 of the $1,285,000 was a withdrawal of the General Partner's share of purported trading profits from the hedge fund's sub-account. The remaining $500,000 of the $1,285,000 Coats Estate received was not debited from either the Coats Estate or the hedge fund subaccounts, but was intended to be from Simmons. Coats Estate transferred $1 million of the $1,285,000 it received to Coats Wealth. Coats Wealth used these funds to purchase a certificate of deposit, which it held for only a few days. After redeeming the certificate of deposit, Coats Wealth re-deposited $980,000 of the proceeds to the Black Diamond accounts. Of this $980,000, $480,000 was re-credited to the Coats Estate subaccount at Black Diamond and $500,000 was re-paid to Simmons, according to notations on the wire transfer.

44.    Black Diamond did not conduct any forex trading, and, consequently, there were no trading profits. Therefore, pursuant to the terms of the Coats Estate sub-account agreement, the joint venture agreement, and the hedge fund agreement, Coats Estate was entitled to receive from the Black Diamond accounts only its principal of $170,000.

45.    Coats Estate received directly from the Black Diamond accounts $115,000 more than it paid in principal to the Black Diamond. Coats Wealth effectively received a net of $30,000 more than it paid to the Black Diamond accounts, when including the effect of the $1 million of Black Diamond funds transferred from Coats Estate to Coats Wealth for the purchase

of the certificate of deposit. Neither Coats Estate nor Coats Wealth provided any goods or services to Black Diamond for the payments they received.

46.     Beginning in August 2008, Davey used more than $1.3 million in funds he withdrew from Divine Ltd.'s Black Diamond trading account to make a series of purported "loans" to Relief Defendant Sovereign Grace, which he controls. Davey, acting through Sovereign Grace, then "loaned" the money to Relief Defendant Shiloh Estate, which Davey also controlled at the time. Davey, through Shiloh Estate, used the customer money for the purpose of purchasing approximately 47 acres of land and constructing a lavish home. Neither Shiloh Estate nor Sovereign Grace made any principal or interest payments to Divine Ltd. customers on the alleged "loans." Neither Sovereign Grace nor Shiloh Estate provided any services to Divine Ltd. in exchange for their use of these funds.

**F.     Coats Controlled GWM and GWP and Was Their Agent**

47.     During the relevant period, Coats held himself out as the principal of GWM and was described as the owner of GWM in various documents and communications. As GWM was the general partner of GWP, Coats exercised control of GWP through his control of GWM. He controlled the bank account opened and maintained in the name of GWP. He was responsible for the content of the GWP account statements distributed to the GWP partners. He also solicited customers to invest in GWP which was controlled by GWM for the purpose of trading forex through Black Diamond.

**G.     Davey Controlled DCS, SHV, SHWI, Divine Stewardship, and SHW And Was Their Agent**

48.     During the relevant period, Davey held himself out as the principal of each of the entities comprising the Davey Common Enterprise and, in various documents and communications, he was described as the administrator and beneficial owner of various entities

comprising the Davey Common Enterprise. He also controlled the bank accounts opened and

maintained in the names of the entities comprising the Davey Common Enterprise. The various

entities comprising the Davey Common Enterprise operated out of the same location, at times

commingled funds, shared officers and owners, and were under common control. Davey had the

ability to control each entity, and was the outright beneficial owner of certain entities.

## II.   CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue Are Proper**

1.     This Court possesses jurisdiction over this matter pursuant to 7 U.S.C. § 13a-l(a)

(2012), which authorizes the CFTC to seek injunctive relief in district court against any person

whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to

engage in any act or practice constituting a violation of the Act or any rule, regulation, or order

thereunder. The CFTC has jurisdiction over the conduct and transactions at issue in this case

pursuant to 7 U.S.C. §§ 2(c)(2)(D) and 13a-l (2012).

2.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2012),

because Defaulted Defendants transacted business in this District, and the transactions, acts, and

practices at issue occurred, are occurring, and/or are about to occur within this District.

**B.    Entry of Default Judgment Against Defaulted Defendants and Defaulted Relief
Defendants is Appropriate**

3.     Under Fed. R. Civ. P. 55(a), a default is entered when "a party against whom a

judgment for affirmative relief is sought has failed to plead or otherwise defend . . . ." Fed. R.

Civ. P. 55(a). Upon entry of default, the defaulted party is deemed to have admitted all well-

pleaded allegations of fact contained in the complaint. *J&J Sports Productions, Inc. v.*

*Romenski*, 845 F.Supp.2d 703, 705 (W.D.N.C. 2012). Entry of default judgment under Fed. R.

Civ. P. 55(b) is left to the sound discretion of the trial court. *U.S. v. Moradi*, 673 F.2d 725, 727

(4th Cir. 1982); *U.S. v. Preiss*, 2008 WL 2413895 at *3 (M.D.N.C.) (citing *Papagianakis v. Samos*, 186 F.2d 257, 263 (4th Cir.1950)). If the Court finds that liability is established, it must then determine damages. *Romenski*, 845 F.Supp.2d at 706. Although the Court must make an independent determination regarding damages, an evidentiary hearing is not required; rather, the Court may rely on affidavits or documentary evidence in the record to determine the appropriate sum. *Romenski*, 845 F.Supp.2d at 706; *see also* generally, *CFTC v. Capitalstreet Financial, LLC*, No. 3:09-cv-387-RJC-DCK, 2012 WL 79758, at *1 (W.D.N.C. Jan 11, 2012) (taking as true the factual allegations of the complaint which were well-pleaded and issuing a final order of permanent injunction that also provided for restitution, a civil monetary penalty and ancillary equitable relief pursuant to Section 6c of the Act). As supported by Plaintiff's Motion and Memorandum and documents referenced therein, entry of default judgment is warranted.

**C.    Defendants Violated 7 U.S.C. § 6b(a)(2)(A)-(C)(2012);**

4.      7 U.S.C. §6b(a)(2)(A)-(C) (2012) makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for, in the case of paragraph (2), with the other person.

5.      During the Relevant Period, Defendants, in soliciting prospective customers, and to encourage existing customers, to invest additional funds, knowingly, or with reckless

disregard for the truth, made misrepresentations and omissions of material facts, namely, that: (1) the Black Diamond trading platform existed and customer funds were invested in forex trading; (2) Black Diamond trading was based on an advisory system created by qualified platform developers; (3) Black Diamond had at least a three year history of highly successful forex trading and consistently earned positive returns for customers with average returns exceeding four percent per month; (4) Black Diamond trading had a one hundred percent success rate (i.e., never a losing month); (5) the risks of trading forex through Black Diamond were limited because Black Diamond promised that no more than twenty percent (20%) of invested funds were at risk at any time and because trading stop mechanisms would be employed if necessary; and (6) sufficient funds were available to be returned to customers upon request. In addition, Defendants Coats and Davey, among others, in an attempt to hide their fraud, knowingly, or with reckless disregard for the truth, made misrepresentations and omissions of material facts, including that: (1) various agencies in the federal government were conducting unrelated investigations that had the effect of freezing Black Diamond accounts; (2) Black Diamond bank documents (altered by proposed Defendants) had a balance of $77 million; (3) banking requirements and restrictions were responsible for delaying distributions to customers; (4) a non-existent German liquidity provider by the name of Klaus was to provide $120 million to Black Diamond to payout customers and replace Black Diamond on the purported platform; and (5) real estate investments existed as security for the funds allegedly being traded in forex through Black Diamond.

6.     During the Relevant Period, Defendants misappropriated customer funds to pay personal expenses, to fund unrelated business interests, and/or to make principal and profit payments to customers in a manner akin to a Ponzi scheme.

7. During the Relevant Period, Defendants provided false monthly account statements to customers that represented that customers had earned profits each month from Black Diamond's trading when, in fact, Black Diamond had engaged in no trading at all.

8. By the conduct set forth above, Defendants violated 7 U.S.C. §6b(a)(2)(A)-(C).

**D. GWM Is Liable for Defendant Coats's Violations of the Act Pursuant to 7 U.S.C. § 2(a)(1)(B) (2012) and 17 C.F.R. § 1.2 (2016)**

9. 7 U.S.C. § 2(a)(1)(B) (2012) and 17 C.F.R. § 1.2 (2016) provide that the "act, omission, or failure of any official, agent, or other person acting for any … corporation … within the scope of his employment or office, shall be deemed the act, omission, or failure of such… corporation …, as well as such official, agent, or other person."

10. Because Defendant Coats committed his violative acts while acting as officer and/or principal of GWM, GWM is liable for Coats's violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

**E. Common Enterprise Liability for DCS, SHV, SHWI, Divine Stewardship and SHW**

11. Courts have found a common enterprise on the basis of the following factors: commingling of funds, use of unified advertising, use of the same marketing materials, routine transfer of funds between themselves, shared officers, failure to separate economic units, and common officers and agents. *CFTC v. Wall Street Underground, Inc.*, 281 F. Supp. 2d 1260 (D. Kan. 2003*); CFTC v. Int'l Berkshire Group. Holdings, Inc.*, no. 05-61588, 2006 WL 3716390 (S.D. Fla. Nov. 3, 2006). As a common enterprise, defendants are jointly and severally liable for the acts of the common scheme. *FTC v. Wolf,* 1997-1 Trade Cases (CCH) ¶ 71,713 (S.D. Fla. Jan. 30, 1996). During the Relevant Period, DCS, SHV, SHWI, Divine Stewardship, and SHW shared the same operational address, commingled funds, routinely transferred funds among themselves, and shared officers and agents. These companies therefore engaged in a common

23

enterprise and are jointly and severally liable for the violations of the common scheme.

**F.      DCS, SHV, SHWI, Divine Stewardship, and SHW are Liable for Defendant Davey's Violations of the Act Pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2**

12.      Because Defendant Davey committed his violative acts while acting as officer and/or principal of the entities of the Davey Common Enterprise, those entities are liable for Davey's violations pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

**G.      Defaulted Relief Defendants Are Not Entitled to Ill-Gotten Gains**

13.      A court may grant equitable relief against a relief defendant if it is established that the relief defendant possesses property or profits illegally obtained, and the relief defendant has no legitimate claim to them. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 n.4 (4th Cir. 2002) ("it is entirely appropriate to allow the Commission to proceed against nominal defendants under the same circumstances in which the SEC could proceed against such defendants") (citing *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)). As set forth above, Relief Defendants Eco-Green, Black Diamond Associates, High South, Gallery Group, Coats Estate, and Coats Wealth received funds and assets in the following amounts from Defendants to which they hold no legitimate interest or entitlement and which were derived from Defendants' fraudulent and violative acts: 1) Eco Green: $188,500; 2) Black Diamond Associates: $1,065,972.83; 3) High South Realty: $758,314.60; 4) The Gallery Group: $236,364; 5) Coats Estate: $115,000; and 6) Coats Wealth: $30,000.

14.      Sovereign Grace received from Davey approximately $1.3 million in funds which Davey had withdrawn from Divine Ltd.'s Black Diamond trading account; however, Sovereign Grace was merely used by Davey as a conduit to pass these funds through to their intended recipient, Shiloh Estate, which then used the funds to purchase property and build a luxury home. All of the funds received by Sovereign Grace were ultimately funneled to Shiloh Estate; it did

not retain any. As the CFTC has previously filed a motion for summary judgment against Shiloh Estate for disgorgement of the full amount of these funds, and as the Court has granted that motion and ordered Shiloh Estate to disgorge $1,305,642.33, the Court shall not hold Sovereign Grace liable for disgorgement of the funds it received and passed through to Shiloh Estate.

## III.    RELIEF GRANTED

### A.    Permanent Injunctive Relief

1.    Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1 (2012), Defendants GWM, DCS, SHV, SHWI, Divine Stewardship, and SHW  are permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2012).

2.    Defendants GWM, DCS, SHV, SHWI, Divine Stewardship, and SHW are also permanently restrained, enjoined and prohibited from:

a.    Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));

b.    Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3(yy) (2016) for Defendants' personal or proprietary account or for any account in which Defendants have a direct or indirect interest;

c.    Having any commodity interests traded on any Defendants' behalf;

d.    Controlling or directing the trading for, or on behalf of, any other person or entity, whether directly or indirectly, by power of attorney or otherwise, in any account involving commodity interests;

e.    Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9); and/or

g. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2016)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38) (2012)), or entity registered, exempted from registration or required to be registered with the Commission.

**B.    Restitution**

3. Defendant GWM shall be jointly and severally liable with Defendant Coats for any restitution imposed by the Court upon Coats in connection with this matter.

4. Defendants DCS, SHV, SHWI, Divine Stewardship, and SHW shall be jointly and severally liable with Defendant Davey for any restitution imposed by the Court upon Davey in connection with this matter.

**C.    Civil Monetary Penalty**

5. Defendant GWM shall be jointly and severally liable with Defendant Coats for any civil monetary penalty imposed by the Court upon Coats in connection with this matter.

6. Defendants DCS, SHV, SHWI, Divine Stewardship, and SHW shall be jointly and severally liable with Defendant Davey for any civil monetary imposed by the Court upon Davey in connection with this matter.

**D.    Disgorgement**

7. Relief Defendants Eco-Green, Black Diamond Associates, High South, and Gallery Group shall disgorge the following amounts:

a. Eco Green shall disgorge $188,500;

b. Black Diamond Associates shall disgorge $1,065,972.83;

c. High South shall disgorge $758,314.60; and

d. Gallery Group shall disgorge $236,364.

All assets of Eco-Green, Black Diamond Associates, High South, and Gallery Group frozen by any financial institution pursuant to the Court's Order of February 11, 2011 (Dkt. #47), shall be released and paid over to the Clerk of the Court upon presentation of this Order to such financial institution. All amounts disgorged by Eco-Green, Black Diamond Associates, High South, and Gallery Group shall be distributed to the victims designated in Defendant Simmons's Judgment in Case No. 3:10-cr-23.

8. Relief Defendants Coats Estate and Coats Wealth shall disgorge the following amounts:

a. Coats Estate shall disgorge $115,000; and

b. Coats Wealth shall disgorge $30,000.

All assets of Coats Estate and Coats Wealth frozen by any financial institution pursuant to the Court's Order of February 11, 2011 (Dkt. #47), shall be released and paid over to the Clerk of the Court upon presentation of this Order to such financial institution. All amounts disgorged by Coats Estate and Coats Wealth shall be distributed to the victims designated in Defendant Coats's Judgment in Case No. 3:11-cr-309.

## IV. MISCELLANEOUS PROVISIONS

1. If any provision of this Order or if the application of any provision or circumstance is held invalid, the remainder of the Order and the application of its provisions to any other person or circumstance shall not be affected by the holding.

2.    The injunctive and equitable relief provisions of this Order shall be binding upon Defendants GWM, DCS, SHV, SHWI, Divine Stewardship, and SHW, upon any person under their authority or control, and upon any person who receives actual notice of this Order by personal service, e-mail, facsimile, or otherwise, insofar as he or she is acting in active concert or participation with them.

3.    This Court shall retain jurisdiction of this cause to assure compliance with this Order, and for all other purposes related to this action. This Order shall be interpreted and enforced according to the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Western District of North Carolina, and all provisions of the Act and Commission Regulations relating or referring to the obligations hereunder.

4.    Copies of this Order may be served by any means, including U.S. Mail, facsimile transmission, e-mail, United Parcel Service, and Federal Express, upon Defendants, Relief Defendants, and any other entity or person that may be subject to any provision of this Order.

**SO ORDERED** this *15* day of *September* 2017 at Charlotte, North Carolina.

Robert J. Conrad, Jr.
United States District Judge